J. G. WHITE *et al.*, Respondents; W. H. STAHL *et al.*, Intervenors and Appellants, v. THE UNIVERSITY LAND COMPANY *et al.*, Appellants.

Kansas City Court of Appeals, April 25, 1892.

1. **Mortgage**: CONDITIONAL SALE: SURPLUS OF PROCEEDS OF SALE. A land company by its articles of association provided for the purchase of a tract of land and directed its director on the receipt of the charter to convey the north twenty acres of the tract to a university. Before this conveyance the university ordered the land company to mortgage the twenty acres for its benefit, agreeing that, if it did not pay the mortgage debt when due, it thereby forfeited its right to the conveyance of said twenty acres. Default was made in the payment of the debt, and sale followed. *Held*, the agreement between the land company and university was a mortgage, and not a conditional sale, and the surplus of the mortgage sale belongs to the university and went to its creditors.

2. ———: ———: ———: RULE OF CONSTRUCTION. If the debt for which the conveyance was made still remains, then the transaction is to be considered as a mortgage rather than a conditional sale; and while the intention should control, if this is in doubt, the conveyance will be held a mortgage rather than a conditional sale.

3. **Creditors' Bill**: ADJUDICATED DEMAND: TRUST FUND. Where a creditor seeks to set aside a fraudulent conveyance of his debtor, he must come into a court of equity with an adjudicated demand, but a bill may be maintained to have a court of equity take charge of the assets of an insolvent and dissolved corporation and distribute it ratably among its creditors without the creditors putting their claim in judgment, such assets being a trust fund for the benefit of all the creditors alike.

4. ———: DISTRIBUTING TRUST FUNDS. A trust fund like the assets of an insolvent corporation, after payment of the legitimate costs and expenses, should be distributed among the creditors *pro rata*.

5. ———: EXPENSES OF PRESERVING TRUST FUND. Where the original plaintiffs have borne all, or the major portion, of the expense incurred in employing counsel and preparing the cause for trial, it would seem just and equitable that such extra expenses be first paid before any distribution is ordered.

White v. The University Land Co.

*Appeal from the Pettis Circuit Court.*—HON. RICHARD FIELD, Judge.

AFFIRMED (*in part*); REVERSED AND REMANDED (*in part*).

*Wm. S. Shirk* and *B. G. Wilkerson,* for appellants.

(1) Plaintiffs had not, prior to the institution of this suit, reduced their claims to judgment. There existed no reason why they could not or should not have done so. They cannot, therefore, maintain this action. *Luthey v. Woods,* 1 Mo. App. 167; *Dodd, Brown & Co. v. Levy,* 10 Mo. App. 121; *Batchelder v. Altheimer,* 10 Mo. App. 189; *Thias v. Steiner,* 102 Mo. 314; *Kent v. Curtis,* 4 Mo. App. 121; *Merry v. Freeman,* 44 Mo. 518; *Roan v. Winn,* 93 Mo. 512; *Humphreys v. Milling Co.,* 95 Mo. 542. The cases of *Turner v. Adams,* 46 Mo. 85; *Pendleton v. Perkins,* 49 Mo. 565, are exceptions to the rule, made so by the peculiar facts surrounding those cases. Nevertheless, they recognize to its full extent the rule we contend for. (2) The circuit court erred in holding that the contract of June 28, 1884, was merely a mortgage of its property by the Sedalia University Company to the University Land Company. Such was not the intention of the parties to said contract, and, in the absence of fraud, oppression or mistake, parties may make, and the law will enforce, any contract not made in violation of law, good morals or public policy. The intention of the parties will be carried out and not frustrated, by the court ₁making a new contract for them. *Brandt v. Robertson,* 16 Mo. 129; *Turner v. Kerr,* 44 Mo. 429; *Slowey v. McMurray,* 27 Mo. 113; *Worley v. Dryden,* 57 Mo. 226; *Cornell v. Hall,* 22 Mich. 377; *Conway v. Alexander,* 7 Cranch, 218; *Smith v. Crosby,* 47 Wis.

160. (3) Defendant's equity, to this surplus, is superior to that of the university company, or plaintiffs as its creditors. The land company paid for the twenty acres of land in the first instance (except $8) out of funds raised by it, entirely outside of this twenty acres; it paid for every dollar's worth of improvements, by money borrowed by it partly upon its own land, outside of this twenty acres; it pledged its other property to increase the value of this, and to aid the university company, and it should stand superior to the rights of all others, after the university company abandoned the university enterprise, and in effect said: "We have abandoned all effort to pay the money you borrowed for us. Here is the land, make it out of it if you can. If you cannot, your other property will be sold to pay it."

*Jackson & Montgomery*, for respondents.

(1) Plaintiffs are seeking to charge the assets of an insolvent and dissolved corporation with the payment of a debt, and were not required to reduce the demand to judgment before bringing its bill, but had a right to commence in a court of equity in the first instance. *First.* Because the funds sought to be reached are trust funds, which are accessible only by the aid of a court of chancery. Wait on Insolvent Corporations, sec. 41, p. 52; Morawetz on Corporations, sec. 1035; *Smith v. Life Ass'n*, 3 Tenn. Ch. 502; *Bank v. Douglas*, 7 Wall. 392; *Railroad v. Ham*, 114 U. S. 504; Story's Equity, 452; *Sanger v. Upton*, 91 U. S. 60; *Railroad v. Howard*, 7 Wall. 410; *Powell v. Railroad*, 42 Mo. 68; *Eppright v. Nickerson*, 78 |Mo. 490; *Herman v. Brittan*, 88 Mo. 555; *Batchelder v. Altheimer*, 10 Mo. App. 184. *Second.* In such case the general creditor is not required to reduce his demand to judgment. *Forster v. Mfg. Co.*, 16 Mo. App. 158; s. c.,

92 Mo. 90; *Batchelder v. Altheimer*, 10 Mo. App. 184; *Mills Co. v. Kampe*, 38 Mo. App. 234; *Williams v. Jones*, 23 Mo. App. 132; *Merry v. Freeman*, 44 Mo. 518; *Pendleton v. Perkins*, 49 Mo. 567; *Hill v. Fogg*, 41 Mo. 569; *Russell v. Clark's Ex'r*, 7 Cranch, 87; *Miller v. Davidson*, 8 Ill. 518; *O'Brien v. Coulter*, 2 Black. 421; *Trustees v. Merrill*, 3 Johns. 98; *Case v. Beauregard*, 101 U. S. 690; *State ex rel. v. Brockman*, 39 Mo. App. 137. (2) The debtor, being wholly insolvent, and the proceeding at law a useless and meaningless ceremony, because wholly unavailing, the creditor is not required to reduce the demand to judgment before proceeding in equity. *Bank v. Kellogg*, 52 Mo. 582; *Shickle v. Watts*, 94 Mo. 420; *Crim v. Walker*, 79 Mo. 335; *Perry v. Turner*, 55 Mo. 423; *Heralson v. Mason*, 53 Mo. 212; *Walker v. Dever*, 79 Mo. 674; *Luthey v. Woods*, 1 Mo. App. 167; *Luthey v. Woods*, 6 Mo. App. 67; *Kent v. Curtis*, 4 Mo. App. 121–131; *Nicters v. Brockman*, 11 Mo. App. 600; *Lackland v. Smith*, 5 Mo. App. 161; *Furlong v. Thomsen*, 19 Mo. App. 367; *Beal v. McVickers*, 3 Mo. App. 592; *Dryden v. Kellogg*, 2 Mo. App. 95. (3) The contract of June 24, 1884, is in effect a mortgage and created the relation of mortgagee and mortgagor between the parties thereto. Jones on Mortgages, secs. 251–8, 263–9, 272–9; *O'Neal v. Capelle*, 62 Mo. 206; *Brant v. Robeson*, 16 Mo. 143; *Worley v. Dryden*, 57 Mo. 228; *Wilson v. Drumrite*, 21 Mo. 329; *Turner v. Kerr*, 44 Mo. 432; *Slowey v. McMurray*, 27 Mo. 113. (4) The court will reward the diligent, and when equities are equal the first in order should prevail. Pomeroy's Equity, sec. 414. The plaintiffs having discovered the assets and filed their bill will be given priority over an intervenor who comes in only when the case is ready for trial in all cases where the assets are not legal and a resort must be had to a court of equity. *Pullis v. Robertson*, 5 Mo.

App. 548; s. c., 73 Mo. 201; *Rozelle v. Harmon,* 29 Mo. App. 569; s. c., 103 Mo. 339; *George v. Williamson,* 26 Mo. 193; *Harris v. Harris,* 25 Mo. App. 496; *Jackman v. Robertson,* 64 Mo. 289; *Lucas v. Atwood,* 2 Stew. 378; *Osgood v. Bank,* 30 Conn. 27; *Gordon v. Lowell,* 21 Me. 251; *McDermot v. Strong,* 4 Johns. Ch. 687; *Corning v. White,* 2 Paige, 567. (5) If the court hold the contrary, then plaintiffs are entitled first to be reimbursed out of funds recovered by the judgment the expenses incurred by them in preparing the action for trial, and their attorneys' fees. 2 Daniels' Chancery Practice, 1213, 1424; *Williams v. Morgan,* 111 U. S. 640; *Myer v. Fenn,* 5 Wall. 205; *Trustees v. Greenough,* 15 Otto, 527; *Williams v. Morgan,* 111 U. S. 699; *Railroad v. Pettus,* 113 U. S. 122–126; *Feshemier v. Baum,* 43 Fed. Rep. 730; *Eastburn & Downes v. Kirk,* 2 Johns. Ch. 317; *Downing v. Marshall,* 37 N. Y. 380; *Railroad v. Wilson,* 11 U. S. 406.

*E. J. Smith,* for Stahl & Ready.

(1) Plaintiffs White, Smith & Wood were corporators of the Sedalia University, the dissolved corporation. They were all the while in its managing board of trustees, Smith nearly all the time president, and White secretary of it, they being the last such officers. In that way they got their information, on which they brought this suit. It was their duty also as such trustees to bring suit in behalf of all creditors of said university. They were, therefore, not entitled to any preference over the other creditors of said Sedalia University. R. S. 1889, sec. 2513; *Williams v. Jones,* 23 Mo. App. 132, and cases cited; *Mill Co. v. Kampe,* 38 Mo. App. 229; *State ex rel. v. Brockman,* 39 Mo. App. 131; *Roan v. Winn,* 93 Mo. 503; 1 Story's Equity [2 Ed.] secs. 546–549; *Colby v. Capp,* 35 N. H. 434;

*Richards v. Ins. Co.*, 43 N. H. 263; *Downey v. Cross*, 7 Wall. 299; 2 Perry on Trusts, sec. 596; *Marr v. Bank*, 4 Cold. 471. (2) Besides, such allowance is like and in the nature of costs, which is always in the discretion of the court, and there is neither law nor practice in this state providing for such as here claimed, and costs must come strictly within the law or they cannot be allowed. So a judgment will not be reversed, because such claim was not allowed. *Walton v. Walton*, 19 Mo. 667; *Shed v. Railroad*, 67 Mo. 687; *In re Murphy*, 22 Mo. App. 476; *Downs v. Kirk*, 2 Johns. Ch. 317; *Downing v. Marshall*, 37 N. Y. 380; R. S. 1889, sec. 2513. (3) It will be seen that nearly all the cases relied on by plaintiffs are cases of simple trustees, acting not for their own benefit, but solely for that of others. To this, *Trustees v. Greenough*, 105 U. S. 527, may be said to be an exception; but that was a case where the trustees proper refused to act and were squandering the fund, and had to be made defendants. *Railroad v. Pettus*, 115 U. S. 116, also was not a case of a trustee proper, but it was all that we said as to last above with the addition that in it there was an understanding between the plaintiffs who filed the bill and their attorneys, that the attorneys should have pay from others who might prove up under the decree.

GILL, J.—The facts of this case as disclosed by the evidence are as follows:

In the year 1882, some of the citizens of Sedalia undertook to establish a school of a somewhat higher standard than the common schools, and for this purpose contemporaneously organized two corporations, one called "The Sedalia University," whose articles of association were acknowledged October 3, 1882, and the other was called "The University Land Company," whose articles were acknowledged October 28, 1882.

The former was organized under the statute relating to the organization of benevolent associations, and the other under the chapter relating to manufacturing and business companies, with a capital stock of $10,000. The promoters of both corporations were in the main the same. The articles of association of the land company contain the following provisions, viz.:

"Sec. 6. The purposes for which this corporation is named is to purchase real estate in and adjoining the city of Sedalia, and to improve, cultivate, sell and dispose of the same. One special object of forming this corporation is to buy a certain tract of land lying south of and adjoining said city of Sedalia, containing about fifty-four acres, and known as the Elisha Barrett farm, and to donate, or sell for a nominal sum, twenty acres thereof, including the improvements to the Sedalia University. And the board of directors are hereby authorized and directed, when these articles of association are complete and filed with the secretary of state, to make and execute the deed of this corporation to said Sedalia University to said twenty acres of land."

The object of organizing the university company was to "found, maintain and establish" a university in the city of Sedalia; and to receive from the land company the north twenty acres of land, which contained the improvements.

The fifty-four acres were bought of Barrett for $10,000, one-half of which was paid in cash, and a note bearing interest executed for the remaining $5,000, secured by a deed of trust on the whole tract. The university company took possession at once of the said north twenty acres, and held it, without question, until June, 1887, and conducted there a school such as the promoters contemplated. The land company in like manner occupies the remaining thirty-four acres, and have held it ever since; never at any time claiming the

right to the twenty acres until in 1888. The land company, until in 1888, always recognized the university company as the owner of the north twenty acres, and on March 23, 1883, appointed a committee of its board to survey and locate the same. The whole of the capital stock of the land company was subscribed, and all paid in except $840; but this deficit left the company this much behind in funds to pay the balance of the debt to Barrett, and the accumulated interest and costs.

The school was opened and conducted, but with continued financial embarrassment, until June, 1884, when the university company needed additional rooms and buildings, and was in sad need of the money to pay for them. Under these circumstances they applied to the land company, who still held the title to the whole fifty-four-acre tract, to borrow upon it the needed funds. They did this, and the contract of June 28, 1884, set out in the plaintiff's petition, was entered into between the land company and the university company. By this contract it was agreed that the land company had, at the request of the university company, borrowed $5,000 of the Missouri Trust Company, for which the land company has executed its note, and secured the same upon the whole fifty-four acres. The net proceeds of the loan were to be used in paying Barrett $878.55, the balance due on the original purchase money of the land, and the balance to be turned over to the university company, to be by them expended in improvement on the said north twenty acres. The university company bound itself to pay the principal and interest of said indebtedness as it matured; and upon such payment being completed was to receive a deed from the land company for the twenty acres, in pursuance of the articles of association of the land company, and the land company should also repay it the said sum of $878.55; but, in

case of default on the part of the university company, then it waived and forfeited all the right to any conveyance or said land from the land company. The money was disbursed, in accordance with the contract; Barrett was paid, and the net proceeds of the loan ($3,800) paid the university company, and expended in improvements on the said north twenty acres.

A difference of opinion existed between the land company and the university company, or arose at this time and was finally settled by the contract as the witnesses state; they could do nothing else. The land company held the title and would not convey it or mortgage it except upon the terms of that contract. The university company had already contracted on the faith of getting the money for an expenditure of $5,000, and they had to borrow the $1,200. The plaintiffs went on the note, and afterwards had it to pay, and this is the demand upon which the action is brought. There is no controversy as to the debt or its amount. The university company carried on the school, paid the interest on the note until June, 1887. Default having then been made, the land company paid interest amounting to $300. The land was again advertised, and plaintiffs bought the note from the Missouri Trust Company, the holder of the note, and again stopped the sale.

On February 2, 1888, the land company declared the land forfeited under the contract of June 28, 1884, and directed Mr. Wilkerson, their president, to take possession of the same. Mr. White had been left in charge of it by the university company, and Mr. Wilkerson got Mr. White to deliver possession to him. Mr. White did so without any direction or authority of the board of trustees of the university company, and without calling any meeting to consider the matter. The school had closed, and no meetings of the board

had been held for several months. From this time on until the foreclosure, Mr. Wilkerson, as the president of the land company, kept possession of the entire premises and collected the rents.

Default still continuing on the payment of the indebtedness represented by the $5,000 mortgage, the holder advertised the same for sale, and the sale was had on the sixth day of March, 1889. This deed of trust, it must be borne in mind, was executed by the land company, and conveyed the whole fifty-four acres to P. H. Sangree, and contained the usual clause, that the proceeds of the sale, after paying the debt, etc., should be paid to the land company, and was claimed from the trustee by the land company. When the trustee was about to offer the land for sale, Mr. Wilkerson, as the president and representative of the land company, requested that the north twenty acres being that part of the tract of fifty-four claimed by the university company be sold first, and it was so offered by the trustee and brought $6,900, which, after paying the debt and costs, left a balance in the hands of the trustee of $866.58. An account was taken by the court and judgment rendered against the defendants. No question was raised, nor is here made, as to the fairness or correctness of the accounting, but the whole question is. as to the right of the plaintiffs to recover at all. The court gave judgment against the defendant for the $878.55, after deducting therefrom such amount as the accounting showed to be proper, and for $935, the proceeds of the sale under the deed of trust, after paying the debt, cost, etc., in the hands of the defendant Sangree, which amounts were to be divided *pro rata* between plaintiffs and intervenors. The plaintiff's claim, in the aggregate, was $688.50, and intervenors', $6,224.65.

This is a sufficient statement for the consideration

of the main controversy, to-wit: Whether or not these original and intervening plaintiffs have any equitable right to the funds in dispute. There is, however, another branch to this suit, and that is as to the relative rights, between plaintiffs (original and intervening) in the distribution of the money. The lower court held they were entitled in the proportion of the amounts of their respective claims, but the original plaintiffs (who begun the suit) claim some priority and appealed from the order of the circuit court on distribution. But of this later on.

I. The facts of this case are more complicated than are the questions of law involved. Indeed, the latter are few, and not very difficult of satisfactory solution. It will be observed that this is a creditor's bill, whereby the plaintiffs, holding claims against the defunct corporation known as the Sedalia University, "seek to reach and appropriate to the payment of said claims certain alleged assets of the debtor corporation." I think the facts may be somewhat simplified by eliminating much that is contained in the foregoing statement and presenting the substance in this manner: In June, 1884, the university corporation was the equitable owner of the twenty acres of land in the vicinity of Sedalia, and desired to borrow thereon the sum of $5,000; and for this purpose applied to the land company (in whom was the legal title of the land) to make a deed of trust to secure the amount said university company desired to borrow. The land company still owed a balance of purchase money on the entire fifty-four acres of $878.55, which it was insisted should be paid out of the proceeds thus to be borrowed by the university company. To this the latter company objected. However, after much negotiation, an agreement was arrived at, and the following contract was executed:

"The University Land Company and the Sedalia University on this the twenty-eighth day of June, 1884, made the following contract and agreement:   At the request of said university, said land company has borrowed from the Missouri Trust Company $5,000, and said land company has executed to said Missouri Trust Company its note for said sum of $5,000, even date herewith, payable to the order of the said Missouri Trust Company, five years after date with interest from date until paid, at the rate of six and one-half per cent. per annum, said interest is payable semi-annually and is evidenced by ten interest coupons for $162.50 each, attached to said note, said coupon and note by their express terms are to bear interest after their maturity until paid at the rate of ten per cent. per annum.   The net proceeds of said note remaining after paying the costs and expenses of said loan to be applied as follows: First to the payments of amounts, $878.55 on the note given by said land company to one J. R. Barrett, for a part of the purchase money of a certain tract of land in section 9, township 45, and range 21, in Pettis county, Missouri, containing fifty-four acres, which said Barrett in the year 1882 sold and conveyed to said land company, and the balance of said proceeds shall be paid over to said university to be used by it, in the erection of improvements on said tract of land.   To secure the payment of said note and coupons said land company has this day executed to one P. H. Sangree, trustee, a deed of trust on said tract of land.   Said university agrees to pay the interest on the said notes semi-annually as it accrues, and becomes due, and according to the terms of said notes and coupons, and to pay said sum of $5,000 when it becomes due, and to pay all interest that may accrue on any of said coupons, or on said note after the maturity thereof, and said university agrees to pay for all insurance and the

buildings on said tract of land by said deed of trust, and also to pay all taxes on the north twenty acres of said tract of land during the continuance of said loan, and the university shall have the use of the north twenty acres of said fifty-four-acre tract of land for five years, provided it pays said interest, taxes and insurance agreeable to this contract, and if the said university shall pay said interest and taxes and pay the said insurance and pay said principal sum of $5,000, when the same becomes due, then the said land company shall convey to said university company in pursuance of the articles of association of said land company twenty acres off the north end of said fifty-four-acre tract, and said land company shall also pay to the said university company said sum of $878.55. But if said university company shall fail or neglect to pay two successive installments of said interest on said note as evidenced by said coupons, or if it shall fail or neglect to pay said taxes or said insurance, or if it shall fail or neglect to pay said principal sum of $5,000 at maturity of said note, then said university waives and forfeits all right to have said twenty acres of land conveyed to it, as provided in the articles of association of said land company.

"In witness whereof, the president and secretary of the board of trustees of said university, by order of the said board, have hereunto signed their names and affixed the seal of said university, and the president of said land company and the secretary thereof, by order of the board of directors, have hereunto signed their names, and affixed the seal of said . company, the day and year first aforesaid."

The gist of the matter, then, is that the university company borrowed this $5,000 pledging its land to pay the same, but let the land company have the sum of $878.55, coupled with a promise of the land company

to return the same. Thus far, then, this clearly was nothing more nor less than an equitable mortgage by the university company of its twenty acres of land. But a further provision occurs in this contract, to-wit: That if the university company failed to pay the debt thus contracted with all interest, etc., as it matures, it is then stipulated that it shall forfeit all right in said land to the land company. The university company did fail to pay, the land was sold under the deed of trust, and it remains to be determined as to who is entitled to the surplus held by the trustee.

The trial court held under this state of facts that the contract between the two corporations was a mortgage, and that as between the university and the land company the surplus arising from the sale by the trustee belonged to said university company; and we are of the same opinion. As already stated in equity the university corporation was at the date of the contract of June, 1884, the owner of the twenty acres of land. By the very terms of its corporate charter the land company was bound absolutely to convey this twenty acres to the university. We quote from its articles of association: "One special object of forming this corporation is to buy a certain tract of land lying south of and adjoining said city of Sedalia, containing about fifty-four acres and known as the Elisha Barrett farm, and *to donate or sell for a nominal sum twenty acres thereof*, including the improvements to the Sedalia University. And the board of directors are hereby *authorized and directed*, when these articles of association are completed and filed with the secretary of state, to make and execute the deed of this corporation to said Sedalia university to said twenty acres of land."

Since, then, what ought to be done will in equity be considered as done, we now regard the university company as having been invested with the title to this

land—free and clear, too, of all or any claim by the land company. And when the land company, at the request of the university company, made this deed of trust on the twenty acres to secure the money borrowed by the owner thereof, it was in nowise different than if the legal title had been lodged in the university, and it had by its own act executed the deed of trust. Stripped then of all irrelevant matter, the university company directed its agent or trustee to borrow money on its own land; and the debt thus secured being paid, the surplus, after sale by the trustee in the deed of trust, belonged, as did the land, to the same company. That the university stipulated in its contract with the land company, that in case of its default in paying said secured debt, etc., "then said university waives and forfeits all right to have said twenty acres conveyed to it, as provided in the articles of association of said land company," does not affect the transaction. It was still in the nature of a mortgage, and the right of redemption still remained. "The mortgagor is not allowed thus to renounce beforehand his privilege of redemption." 1 Jones on Mortgages [4 Ed.] sec. 251; *Wilson v. Drumrite*, 21 Mo. 325.

It seems to be the contention of defendant's counsel, that this arrangement between these twin corporations, as evidenced by the writing executed in June, 1884, was in the nature of a *conditional sale*, and not a mortgage. The position is untenable. It will not bear the uniform tests in such cases. It seems settled law, that notwithstanding the absolute form of the conveyance, if the debt for which the same was made still remains, then the transaction is to be considered a mortgage rather than a conditional sale. *Slowey v. McMurray*, 27 Mo. 113; *Turner v. Kerr*, 44 Mo. 429.

The intention of the parties should control, and if this is in doubt it will be held a mortgage rather than a

conditional sale, as it would be more just and equitable. *Brant v. Robertson*, 16 Mo. 129. Measured then by these well-established rules, the agreement of June, 1884, was in the name of a mortgage. There was all the time, at and subsequent to said agreement, a binding obligation on the university to pay the debt; and if the land company had paid off the incumbrance when it matured, or paid the interest, taxes and the like, it would have had recourse on the university. We conclude, therefore, that, as between the university and the land company, the surplus in the hands of Sangree, the trustee, remaining after paying the mortgage debt, belonged to the former; and as a necessary consequence, too, that the land company was indebted to the university company for the return to it of the $878.55 paid to Barrett out of the proceeds of said $5,000 loan.

II.   It is claimed, however, that plaintiffs are not entitled to maintain this suit in equity for the reason that their claims had not been reduced to judgment. There is no doubt as to the general proposition that, where a creditor seeks to set aside the alleged fraudulent conveyance of his debtor, he must come into a court of equity with an *adjudicated demand*. He has no right to question the act of his alleged debtor, unless he is shown to be a genuine, *bona fide* creditor; and, as a general rule, it is held that this must first be established by the judgment of a court of law. But this rule even has many exceptions. While admitting it to be necessary that a party shall first exhaust every legal remedy before resorting to the court of equity, yet the courts have, in a great variety of cases, permitted the creditor to apply in the first instance to the court of chancery, as, for example, where it appears manifest that a suit at law would be wholly unavailing.

VOL. 49—30

*Luthey v. Woods,* 1 Mo. App. 168, and cases cited. But the case at bar is one of quite a different nature from those applying the rule above stated. This is a suit belonging peculiarly to the jurisdiction of equity. The prime object sought by this bill is to have the court take charge of the assets of an insolvent and dissolved corporation, and distribute it ratably among its creditors. The suit was brought by certain named creditors not only in their own behalf, but as well for all other creditors who might see proper to come into the litigation. And others did come in, and were made parties to the suit. These assets of the insolvent corporation had become trust funds for the benefit of all creditors alike, and, in the absence of the managing head of the corporation itself, and in the presence of a threatened wrongful diversion, a court of equity was asked to lay hold of these funds and apply them to the subjects entitled. A court of equity, in cases of this nature, will take hold of the assets of the defunct corporation, and will settle the respective rights of all claimants, and distribute the same according to equity and good conscience, regardless, too, as to whether the claim may have been reduced to judgment or not. *Kankakee Woolen Mills Co. v. Kampe,* 38 Mo. App. 229, and cases cited; *State ex rel. Noll v. Brockman,* 39 Mo. App. 137; *Foster v. Mill Co.,* 92 Mo. 90.

As we view this controversy, then these plaintiffs (original and intervening) had a superior right to the funds in controversy as against the land company, and, therefore, in that regard, we affirm the judgment of the lower court.

III. This trust fund having been secured, some controversy arose between the original plaintiffs and those subsequently coming in as to the distribution thereof. It will be remembered that the original petition was filed by plaintiffs, White, Smith and Wood, in

March, 1889. Subsequently an amended petition was filed, wherein the plaintiffs set out that they sued "for themselves and such other creditors of the university company as may appear and unite with them in the prosecution of this cause." In May, 1890, creditors Stahl and Ready, by permission of the court, came in and joined as coplaintiffs. The claim of White and Smith and Wood (the original plaintiffs) amounted to $688.50, while that of the intervening plaintiffs aggregated $6,224.65. As to the amount of these claims, there is no dispute. But the original plaintiffs moved the court, in distributing the amount recovered (which was about $1,700), to order their claim paid in full out of the fund, and the remainder to go to the intervenors. This the court refused, but ordered the fund to be paid out to the different creditors in proportion to the amounts of their respective claims.

Afterwards, to-wit, on the same day, the plaintiffs made application moving the court to make an allowance out of the amounts for which judgment was rendered in this case for plaintiffs as attorneys' fees, for the prosecution of this cause, and for the other expenses incurred by said plaintiffs in procuring evidence and preparing for trial.

And upon the same day the application coming on to be heard, the plaintiffs offered to introduce evidence tending to show the rendition of the services of the attorneys for the plaintiffs, in the prosecution and trial of said cause, and the value thereof and of the expenses incurred by the plaintiffs in the preparation of said case for trial, and that the cause was wholly prepared and tried upon its merits by the attorneys employed by the original plaintiffs, which testimony the court refused to admit, and to this action of the court, in refusing to admit said testimony, the plaintiffs then and there excepted at the time. The court overruled the same

and refused to make the plaintiffs any allowance as attorneys' fees or for expenses as aforesaid, and to the action of the court, in refusing to enter said allowance, the plaintiffs then and there excepted.

IV. Clearly these original plaintiffs were not entitled to any preference over the other plaintiffs in the distribution of this fund. While it is true they were the original movers in the effort to save these assets of the debtor corporation, yet such suit was brought for and in behalf of the intervening plaintiffs. Stahl and Ready were invited to come into the litigation and to share its success or defeat. They did enter the controversy, and were made coplaintiffs. By the suit the fund was saved, and it composes, under the well-settled doctrine, a trust fund for the benefit of *all* these creditors of the insolvent corporation. After the payment of the legitimate costs and expenses the funds should be distributed among these creditors *pro rata*. *Kankakee Woolen Mills Co. v. Kampe*, 38 Mo. App. 229, and numerous other authorities that might be cited.

V. If, however, these original plaintiffs have borne all, or the major portion, of the expenses incurred in employing counsel and preparing the cause for trial it would seem just and equitable that such extra expense be first paid before any distribution is ordered. But the court below seems to have taken a different view, since the offer of the plaintiffs to show the rendition of the services of their attorneys in the preparation, prosecution and trial of said cause, and the value thereof, as well as other expenses incurred by the plaintiffs in the preparation of the cause for trial, and that said attorneys did the entire work in said cause was denied, and the court refused to make any allowance whatever therefor.

In this ruling we think the court erred. Here was a fund belonging in common to these plaintiffs and intervenors; and, if the truth be, as plaintiffs offered to

prove, that by their efforts and at their expense the fund was saved for the benefit of all alike, then every sense of justice would suggest that plaintiffs and intervenors alike bear each their portion of such expenses. We are furnished a decision from the United States supreme court quite in point. *Trustees v. Greenough,* 105 U. S. 527. That was a case instituted by the holder of certain railroad bonds, on behalf of himself and others similarly situated, to save from waste and spoliation certain property in which all the bondholders had a common interest. In the prosecution of the suit the plaintiff was necessarily put to large expense for attorneys' fees and the like. He was successful, and the fund was brought into court for distribution. The plaintiff asked, and the circuit court granted, the payment out of the common fund of these attorneys' fees and expenses necessarily incurred for the common benefit. The supreme court sustained the lower court, and in the opinion used this language: "It is a general principle that a trust estate must bear the expenses of its administration. It is also established by sufficient authority that where one of many parties having a common interest in a trust fund, at his own expense, takes proper proceeding to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement either out of the fund itself or by proportional contribution from those who accepted the benefit of his efforts. The same rule is applied to creditors' suits where a fund has been released by the diligence of the plaintiff." The same court in at least one subsequent opinion indorsed the foregoing rule. *Central Ry. Co. v. Peters,* 113 U. S. 122. For a very full and able discussion of the question involved, we refer to the opinion by Mr. Justice BRADLEY in the *Greenough* case, 105 U. S. 527.

It follows then from the foregoing considerations

that we affirm the judgment as against the defendants, but must reverse the judgment, and remand the cause so that the court may permit the original plaintiffs to show, and that the court may allow, such reasonable attorneys' fees and other expenses which said plaintiff may have incurred in the institution and prosecution of the cause. All concur.