WEED et al. v. CENTRAL OF GEORGIA RY. CO. et al.

(Circuit Court of Appeals, Fifth Circuit.  January 23, 1900.)

No. 877.

1. RECEIVERS—INTERVENTION—COUNSEL FEES — ALLOWANCE FROM FUND IN COURT.

To entitle an intervening creditor in pending litigation between the various parties having conflicting interests in the properties of insolvent railroad companies to an allowance of solicitor's fees from the fund in court produced by the litigation, it must appear that the intervention resulted in benefit to such fund or to the other parties interested therein. There is no authority for making such an allowance where the only questions raised by the intervener were such as must inevitably have arisen between the other parties, and in which the interests of the receiver, previously appointed and provided with counsel by the court, were identical with those of the intervener, and there is no evidence that either the receiver or his counsel were negligent in protecting his trust.

2. SAME.

The fact that an intervener, in behalf of himself and others, applies for and obtains the appointment of a co-receiver for property already in the custody of the court, affords no ground for the allowance to him of solicitor's fees from the fund resulting from the litigation.

Appeal from the Circuit Court of the United States for the Southern District of Georgia.

Walter G. Charlton, for appellants.

A. H. Lawton and T. M. Cunningham, for appellees.

Before McCORMICK and SHELBY, Circuit Judges, and BOARMAN, District Judge.

BOARMAN, District Judge.  The appellants claim $15,000 as an allowance for solicitors' fees due to them, as they contend, for services rendered in the prosecution of the intervention of their client John S. Tilney, in a suit pending in the circuit court of the United States for the Southern district of Georgia, which involved the properties of the Central Railroad & Banking Company of Georgia. They seek to have the allowance claimed paid out of the fund arising from litigation in said suit, and the settlement thereof, a part of which fund is yet in the registry of the court awaiting further consideration.  The matter of the appellants' claim was passed on by a master, who reported in favor of allowing them $5,000.  The defendant company filed exceptions to the master's findings, and on the hearing thereof the circuit court, holding that the fund was not liable for the appellants' claim, refused to allow them anything. From this decision the appellants prosecute this appeal.

The transcript shows a stipulation as to the facts, in which appears an historical recital of the numerous bills and pleadings under or in which a long contested litigation was prosecuted to a final adjustment of the several conflicting interests in a reorganization of the defendant companies.  For the purpose of this inquiry, it is not necessary to set out in detail the several suits which were filed or considered in the circuit and in the circuit court of appeals for

this circuit. In further considering the appellants' claim, we will recite some of the matters out of which they contend that their right to be paid out of the fund arises. The appellants' claim is founded on two distinct grounds, which may be stated as follows: (1) That the intervention filed in the main cause by John S. Tilney, who was represented by them as counsel, first raised the question, which was subsequently adjudicated in favor of the position taken by him, that the Southwestern Railroad Company was a joint obligor, and not a surety, of the Central Railroad & Banking Company of Georgia upon the tripartite bonds; (2) that, as counsel representing John S. Tilney and other security holders, they filed an intervention in the cause, asking for the appointment of a receiver with H. M. Comer, which intervention resulted in the appointment of R. Sommers Hayes as a co-receiver. The parent or original suit of the numerous suits which we are considering was begun in equity under a bill filed by Rowena Clark on March 4, 1892, against the Central Railroad & Banking Company of Georgia. That company, on July 4, 1892, filed its bill in equity, dependent on the bill of Rowena Clark, against all of its creditors. Among its creditors was the Farmers' Loan & Trust Company, trustee for the first-mortgage bonds, and the Central Company of New York, trustee for the second mortgage bonds. Under these several bills the properties of the Central Railroad & Banking Company of Georgia, afterwards known as the "Central System," passed into the hands of H. M. Comer, as the sole receiver. The bonds for which the Farmers' Loan & Trust Company of New York was trustee were known as the "Tripartite Bonds." The tripartite mortgage consisted of three separate mortgages executed by the Southwestern Railroad Company, the Central Railroad & Banking Company of Georgia, and the Macon Western Railroad Company; each of the three mortgages being a first lien upon the railroad and properties of said three companies. The Farmers' Loan & Trust Company of New York was the trustee under each of these three mortgages, and that company instituted suit in January, 1893, to foreclose on the tripartite bonds; this becoming the main or leading suit in all the subsequent litigations. This bill, as against the parties defendant, namely, the Central Railroad & Banking Company of Georgia, the Southwestern Railroad Company, and the Central Trust Company of New York, representing the second mortgage bonds, sought to have the Southwestern Railroad and the Macon Western Railroad sold as an entirety to satisfy the tripartite bonds. On May 1, 1893, the Central Trust Company of New York filed its answer to the foreclosure bill of the Farmers' Loan & Trust Company, answering and protesting that the sale sought to be had under the bill of the Farmers' Loan & Trust Company should not include the property of the Georgia Central Company from Savannah to Atlanta, but that a sale should be had of the railroad and properties of the Southwestern Railroad Company; contending, further, in its answer, that the holders of the bonds secured under the first mortgage represented by the complainant in the bill should be required to resort, first, to the fund arising from the sale of the railroad and properties of the South-

western Railroad Company before resort should be had to any of the fund arising from the sale of the main line of the Georgia Central Railroad Company, as aforesaid. At this period of the litigation, on May 25, 1893, Tilney was allowed to intervene in the pending suits. Tilney in his intervention represented himself as a stockholder of the Central Railroad & Banking Company of Georgia, and the owner of certain unsecured certificates, showing an indebtedness of that company to him. The appellants say that while the numerous bills in the litigation, involving the properties of the Central Railroad & Banking Company of Georgia, were pending in the circuit court, it became a material and important question to all the creditors, who may be beneficiaries of the trust fund, as to whether the Southwestern Railroad Company was, and should in law be held as, a surety, or as a co-obligor on the tripartite bonds. Looking at the litigation from the present standpoint, it seems clear, as appellants contend, that Tilney and other stockholders and creditors of the Central Company, as well as the said company itself, were materially interested in securing an adjudication in the several suits which would hold the Southwestern Railroad liable on the tripartite bonds as a co-obligor. They are correct, too, in saying that Tilney's intervention raised a question of vital importance to the properties of the Central System, which was then in the hands of the receiver, because, if the court should hold that the Southwestern Railroad Company was only a surety, and not a co-obligor, the fund arising, or to arise, from the administration of the property of the Central System, would to that extent be diminished. In the absence of any effort on the part of the Central System to secure such final adjudication, the intervention of Tilney should, or would, be considered as timely, and aidful, essentially, in the protection of the common interest of all the beneficiaries of the resulting fund, because, at the time of Tilney's intervention, it is apparent from the subsequent pleadings in the several suits that the said railroad would endeavor, and may have been then endeavoring, to escape liability, as a co-obligor, on the tripartite bonds. It is true, that Tilney in his pleadings called attention to the attitude of the several companies, as to their conflicting interests; but we do not agree with the contention of appellants' counsel that Tilney, in becoming an intervener, or by his pleadings calling the attention of the court to the fact that the Southwestern Railroad was an adversary defendant, can be considered or treated, in relation to the fund or property then being administered by the receiver, as a trustee, whose solicitors should be paid out of the fund; nor does it appear from the evidence, which illustrates the legal relations and interests of the several parties in litigation, that he in his intervention was a necessary party to conserve, or in conserving, the interests of the beneficiaries who were ultimately to share in the resulting fund. It appears that his intervention, so far as the Central System and its interests were concerned, may have been superserviceable; for his intervention seems to have presented no question or law issue which was not antecedently raised, or would certainly, ex necessitate rei, have been raised, by the beneficiary of the tripartite

bonds,—that is, that the Southwestern Railroad Company's properties, as well as the properties of the other roads, all of which were clearly included in the tripartite mortgage, should all be ultimately sold together as an entirety.  As a matter of fact, the pleadings in the litigation in which Tilney intervened show that the Southwestern Railroad Company in its pleas filed April 3, 1893, raised the question itself as to the nature of its liability on the tripartite bonds.  Later, May 27th, the said railroad filed a cross bill denying liability therein, except as a surety.  To this cross bill Tilney was not made a party, and he never answered the Southwestern Railroad's contention, nor did he file any answer to the foreclosure bill. The suit of the Farmers' Loan & Trust Company, with the intervention of Tilney, and the cross bill of the Southwestern Railroad, denying its liability as a co-obligor, reached the court of appeals for this circuit, and was certified by that court to the supreme court. While the matter was pending in the supreme court, the whole litigation lapsed, because the parties interested made a satisfactory reorganization of the properties involved, and, as a matter of fact, the question which Tilney sought by his intervention to have adjudicated was never passed on finally by any court.  It is clear that Tilney's interests on this question were the same as those of the Central Trust Company.  Both desired the Southwestern Railroad to be held in law as a co-obligor, and to be sold, with the other roads, for the satisfaction of the tripartite bonds.

The appellants cite Trustees v. Greenough, 105 U. S. 532, 26 L. Ed. 1160, and Railroad Co. v. Pettus, 113 U. S. 116, 5 Sup. Ct. 387, 28 L. Ed. 915, in which the Greenough Case is quoted with approbation.  An analysis of the facts in the pending case, and of the facts and reasoning on the rule of the court in the Greenough Case, shows clearly two distinct cases.  In the pending case all the properties of the defendant companies which were liable on the tripartite bonds were in the hands of, and being administered by, a receiver, who was aided by counsel appointed by the court, and there is no evidence to show that either the receiver or his counsel were negligent in their official duties in administering and preserving all the properties for the benefit of the creditors, or that they were negligent or inefficient in their efforts to conserve the interests of their trust by holding all three of the named railroads as co-obligors. The interest of the receiver and of his counsel, in the line of their duties, was one in common with the interest of the intervener.  The ground upon which the court in the Greenough Case rested its purpose to give an allowance to the counsel therein seems to be set forth in a quotation which we have taken from it, as follows:

"As to the point made by the appellants, that the complainant is only a creditor seeking satisfaction of his debt, and cannot be regarded in the light of a trustee, and therefore is not entitled to an allowance for any expenses or counsel fees beyond taxed costs, as between party and party, a great deal may be said.  In ordinary cases the position of the appellants may be correct. But in a case like the present, where the bill was filed, not only in behalf of the complainant himself, but in behalf of the other bondholders having an equal interest in the fund, and where the bill sought to rescue that fund from waste and destruction arising from the neglect and misconduct of the trustees, and to

bring it into court for administration according to the purposes of the trust, and where all this has been done, and done at great expense and trouble on the part of the complainant, and the other bondholders have come in and participated in the benefits resulting from his proceedings, if the complainant is not a trustee, he has at least acted the part of a trustee in relation to the common interest. He may be said to have saved the fund for the cestuis que trustent, and to have secured its proper application to their use. There is no doubt, from the evidence, that, besides the bestowment of his time for years almost exclusively to the pursuit of this object, he has expended a large amount of money for which no allowance has been made nor can properly be made. It would be very hard on him to turn him away without any allowance except the paltry sum which could be taxed under the fee bill. It would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage. He has worked for them as well as for himself, and, if he cannot be reimbursed out of the fund itself, they ought to contribute their due proportion of the expenses which he has fairly incurred."

The evidence in the pending case, as to the services of intervener's counsel being useful to all of the other bondholders, is wholly unlike the evidence recited in the opinion quoted from the Greenough Case. In that case there was a maladministration by the trustee, and consequently a great waste of property that was under administration for the benefit of creditors. The evidence in that case shows that the complainant rescued the property from waste, and possibly utter destruction. In the pending case the evidence does not show that there were any betterments in the estate from anything that came peculiarly out of Tilney's intervention, nor does it show, as is made apparent in the Trustees v. Greenough Case, that the prosecution of Tilney's intervention resulted in reclaiming or rescuing the trust fund, or conserving any wasting fund or property, to be subjected to the creditors of the Central System. So far as the evidence shows, if his intervention had been successfully prosecuted to a final adjudication, which it was not, there is nothing in the evidence illustrating the relations of the appellants to the resulting fund, or to the several suits filed in the interests of conserving the fund, from which, in the light of the Greenough Case, we can reach the conclusion that the property administered for the benefit of the lienholders and other creditors was in itself made more valuable or beneficial to such creditors by reason of appellants' services on behalf of Tilney and his co-suitors. In the Pettus Case, 113 U. S. 116, 5 Sup. Ct. 387, 28 L. Ed. 915, cited by the appellants, it appears that certain unsecured creditors of a railroad company of Alabama instituted in the court of that state an independent proceeding in equity, on behalf of themselves and of all such other creditors who should come in and contribute to the expenses of the suit, to establish a lien in the interest of such creditors upon the property of that company, which was then in the hands of another railroad corporation that had purchased and was holding the same as its property. The solicitors in that case, as it was shown, undertook to prosecute the case for that class of creditors for a small fee, with the understanding that an additional fee should be paid out of the fund if the lien sought by them should be established upon the property of the adverse corporation. The suit was successful, an equitable lien on the reclaimed property

was established, and the court allowed all that class of creditors to become the beneficiaries of the lien. Under the law of Alabama, the solicitors were entitled to a lien on the judgment for their fees. The court in that case, in speaking of the creditors for whom the solicitors secured the valuable lien on property held adversely to them, said the creditors resided in several states; that co-operation was impracticable, and, if some did not move, the interest of all would have suffered,—thus likening the efforts of the solicitors to the meritorious services of salvors. The force of that suggestion shows that that case was different materially from this one in its historical facts, as well as different in the principle or rule of law therein applied from the principle which we think should be applied to the facts in the pending case. The general rule is that a client must pay his own solicitor. If he does not, and the solicitor seeks to impose his fees upon the fund in the court, the burden is upon him to show that his claim comes fairly and squarely upon the equitable principles upon which such allowances are made. We can see nothing in the authorities cited by the appellants to authorize us to allow anything on the first grounds of their claim for solicitors' fees. It is true that Tilney, in behalf of himself and others, after he became an intervener, sought the appointment of a co-receiver for the Central System. We think there is less reason to allow the appellants a solicitor's fee for this interposition on the part of Tilney than there is, or should be, in the matter we have just disposed of. There is nothing in the authorities to which our attention has been directed that will authorize an allowance for such services as the appellants may have rendered to secure the appointment of a co-receiver. That kind of service is certainly such a service as should be paid for by their clients. In the case of Ober & Sons Co. v. Macon Const. Co., 100 Ga. 638, 28 S. E. 388, a matter somewhat analogous to the claim which we are now considering was disposed of. Certain intervening creditors therein made an independent petition to the court to sell certain property remaining in the hands of the court undisposed of, and upon the allowance of their petition, and the sale of the property, they made application for counsel fees, which were disallowed on the following grounds: That counsel moving for fees were not the counsel for the original creditors; that the fund was all in the hands of the court; that it was not apparent to the court that counsel for the intervening creditors had performed such an extraordinary service, either in preserving or increasing the fund, as would entitle them, upon equitable consideration, to be paid an allowance for solicitor's fees; that there was no necessity for any action by them; that to speed the cause of their clients is one of the ordinary duties of counsel, for which they are supposed to receive ample consideration from them. We concur fully with the judge of the circuit court that the claim of the appellants' solicitors should not be allowed against the trust fund, and the decree is affirmed.