## MITCHELL v. WHITMAN et al.
### No. 10799.

Circuit Court of Appeals, Eighth Circuit.

Feb. 15, 1938.

Henry S. Mitchell, of Minneapolis, Minn. (James L. Hetland, of Minneapolis, Minn., on the brief), for appellant.

James E. Dorsey, of Minneapolis, Minn., for appellee E. A. Whitman, receiver, etc.

Warren S. Ege, of St. Paul, Minn. (M'Cready Sykes, of New York City, George W. Morgan, of St. Paul, Minn., Stewart & Shearer, of New York City, and Kellogg, Morgan, Chase, Carter & Headley, of St. Paul, Minn., on the brief), for trustees of First General Mortgage and Trustees of Superior and Duluth Division and Terminal First Mortgage.

John L. Erdall, of Minneapolis, Minn., for intervener Minneapolis, St. P. & S. St. M. Ry. Co.

Before STONE and WOODROUGH, Circuit Judges, and DAVIS, District Judge.

STONE, Circuit Judge.

This is an appeal from an order denying an allowance of attorney fees for services claimed to have been rendered by appellant to the receivership estate.

Appellant is an attorney of ability and standing who has, for some years, been the

918

general counsel of the Minneapolis, St. Paul & Sault Ste. Marie Railway Company (popularly called the "Soo") upon an annual salary. The Soo has long been the owner of a railway system extending from the cities of Minneapolis and St. Paul eastward to Sault Ste. Marie, Mich., westward to the Missouri river, and northwest and west across North Dakota and Minnesota to the Canadian boundary, with connections at various points with the Canadian Pacific Railway and also with branch lines in Minnesota, North Dakota, Wisconsin, and Michigan. The Wisconsin Central Railway Company is a railway line connecting the cities of Ashland and Superior (both in Wisconsin), Duluth, Minneapolis, and St. Paul with Chicago and Milwaukee.

For the highly important purpose of securing connection with and entry into the great freight and passenger point of Chicago, the Soo leased all of the line and all of the property of the Wisconsin in 1909 for a term of ninety-nine years. This lease passed the sole control and exclusive operation of "said railways and every part thereof" to the Soo. The lease also passed "sole control of all the funds and other assets of the Lessor, whether current or accumulated, and also of all earnings of said leased railways and other properties during the term hereof (including any proceeds from the sale, rent or royalties of any and all lands now held and owned by the Lessor or held in trust for its benefit, or which it shall acquire during the term of this lease over which the Lessor has or may have control) to be used, however, wisely and prudently according to its best judgment for the sole purpose of operating, maintaining and improving the railways and other properties hereby leased, and for meeting and discharging the taxes, charges, liabilities and obligations of the Lessor pertaining thereto and any interest payable on account of the same, and, so far as may be legally possible, for the payment of such dividends on the outstanding capital stock of the Lessor as the Board of Directors of the Lessor may from time to time declare, provided, however, that the Lessee shall not in any event, commingle said earnings, funds or assets with its own, and that it shall keep and maintain with respect thereto, a separate and complete system of accounting and auditing during the full term of this lease.

But said earnings, funds and assets shall stand charged in favor of the Lessors with the payments to be made for the said purposes or for other purposes in accordance with the provisions contained in this lease."

Further the lease provided for payment, "out of the earnings of the properties hereby demised," of all management, maintenance, and operating expenses and all interest on indebtedness of lessor and all taxes, license fees, duties, and assessments against the leased property or on the gross earnings thereof. The lease provided that the obligations of the lessee as to payment of operation, taxes, fixed charges, etc., "shall not be construed as requiring the Lessee to become financially responsible in any such respect, but that all such expenses may be paid by the Lessee out of the earnings of the railways and other properties of the Lessor." There was a provision for termination of the lease upon failure of performance by the lessee. The above provisions of the lease are stated to outline the character of the control given the lessee, the source and method and scope of the compensation to be paid therefor, and the term and condition of earlier termination of the lease. Such outline is sufficient for the purposes here.

Prior to November 30, 1932, the revenues of the Wisconsin became insufficient and the Soo made advances from its own funds. On that date, the Wisconsin was served with notice that the Soo "will as soon as may be cease to operate and maintain the Wisconsin Central properties unless satisfactory arrangements be forthwith made to furnish this company with funds with which to meet the deficits to be incurred in such operations and maintenance; that, if such arrangements be forthwith made, this company will be pleased to continue such operations and maintenance in all other respects on the present basis and with the same diligence and efficiency as are used in the operations of this company's own properties; and that this company stands ready to deliver possession of the said properties to said Wisconsin Central Railway Company upon demand."

On the same day the Wisconsin board of directors served its reply to this notice on the Soo. This reply was as set forth in the footnote.[1]

[1] "Whereas this company is without funds, credit, or other resources with which to meet the deficits to be incurred in the operation and maintenance of its said railway properties and thus cannot provide for their continued operation and

On December 2, 1932, occurred the following: A bondholding creditor filed a complaint praying receivership; the Wisconsin answered, joining in the prayer for a receiver; the Soo sought an order allowing intervention; the order was entered; the intervening petition was filed; an order was entered making the Soo a party plaintiff; the Soo, as intervener, filed a bill of complaint against the defendant; the Wisconsin answered; · a receiver was appointed and qualified; the receiver filed a petition for authority to take possession and to execute a designated operating agreement with the Soo; and an order was entered authorizing the receiver to execute the operating agreement effective as of 12:01 a. m., December 3, 1932.

This operating agreement was in force during the time appellant performed the services in respect to Wisconsin tax controversies which are a part of the services for which recovery is sought. In so far as here material, an outline of that agreement is as follows: "The Railway Company is hereby appointed the agent and representative of the receiver to operate and maintain said properties in behalf of the receiver on the operating and maintenance basis provided in such lease and the schedule hereto attached, said Railway Company to collect the revenues of such properties and apply the same in discharge of the costs of the operation and maintenance thereof, including taxes and assessments, allocating to the costs of such operation and maintenance all directly assignable costs and apportioning costs not so directly assignable on the basis of said schedule hereto attached."

Monthly reports of the results of operation and maintenance were to be made by the Soo to the receiver with settlements resulting in payment to the receiver of net credit balances and by him to the Soo of deficits. The "schedule hereto attached" consisted of an extended and detailed statement of "Bases for Dividing Operating Revenues and Expenses between Soo and Wisconsin Central Railway Companies." The parties here seem in agreement that the salary of appellant as general counsel of the Soo is provided for in schedule items "451—Sal. & Exp. Gen'l. Off." and "452— Sal. & Exp. Clks. & Att." under the general heading of "Operating Expenses—Miscellaneous—General"; and, also, that allocation thereof was on the basis of all charges for maintenance of way and maintenance of equipment and transportation, which resulted in 60 per cent. to the Soo and 40 per cent. to the receiver.

Appellant divides the services for which he seeks recovery into nine items. Of these, six items had to do with different steps in a rather extended controversy with the State of Wisconsin over taxation of the Wisconsin Central. The three other items had to do with initial and early proceedings in the receivership of the Wisconsin Central.

In the order denying the allowance, the court stated the reasons therefor as follows: (1) As to the services in connection with the initiation of the receivership, such services were within appellant's duties as general counsel for the Soo; (2) as to the services in connection with the Wisconsin taxes, (a) the regular client (the Soo) of appellant had a special interest in this tax litigation and, although appellant's services were beneficial to the receivership estate, he had not applied for nor been appointed special counsel for the receiver and that official had his own counsel, appointed by the court,

maintenance by Minneapolis, St. Paul & Sault Ste. Marie Railway Company.

"Resolved, that the Board of Directors of Minneapolis, St. Paul and Sault Ste. Marie Railway Company be forthwith notified to the above effect; and

"Whereas this Board has been considering the advisability of demanding that the Minneapolis, St. Paul & Sault Ste. Marie Railway Company deliver possession to this company of this company's said railway properties in view of the threatened non-operation of said properties by Minneapolis, St. Paul & Sault Ste. Marie Railway Company and the fact that this company will be unable during the immediate future and for many months to operate and maintain its said properties itself, both because of its above stated inability to meet the deficits to be so incurred and because it is not now provided with the facilities for conducting such operations and maintenance and cannot acquire them without prolonged delay, including particularly the necessary operating, engineering, accounting, freight and passenger traffic, departments, personnel and officers, without which it is impossible for this company to operate and maintain its said railway properties; and

"Whereas this Board has arrived at no decision respecting that question.

"Resolved, that this Board give further consideration to said question."

who represented the receiver in the tax controversy; (b) these services were covered by the provisions of the operating agreement and under a prior lease (in many respects continued by the operating agreement as a basis of mutual action) and had been paid by the receiver.

### I. Receivership Services.

The services in connection with initiation of and in the early stages of the receivership for which appellant makes claim for compensation are stated in his brief as follows:

"(1) Making the preliminary investigations of law and facts and drafts of legal papers required for placing the Wisconsin Central properties in receivership in the Federal Court.

"(2) Collaborating with counsel for the plaintiff Northwestern Fire & Marine Insurance Company, in submitting to him the results of the foregoing preparations, and in appearing with him in Court to explain the situation and obtain the orders for the Receiver's appointment and taking custody of the assets.

"(3) Rendering certain lesser incidental services facilitating the administration of the receivership and keeping down the expenses."[2]

Appellant expressly concedes the important special interest of the Soo in the

---

[2] The testimony by appellant particularizes these services as follows:

"Initial Preparations for This Receivership.

"This preliminary work had been performed by petitioner because he was advised on or about October 1, 1932, by the executive officers of the Soo that it was about to discontinue its operations of the Wisconsin Central properties at its own expense; and because he was instructed by said individuals, who were also the executive officers of the Wisconsin Central, to outline the necessary procedure for obtaining a receivership of its properties in order to preserve their value by keeping them in operation. The following questions were thereupon thoroughly investigated, authorities briefed, and proper conclusions reached.

"Whether the usual procedure of initiating the receivership on a bill of complaint signed by a general unsecured creditor having the necessary diversity of citizenship should be followed, the conclusion being adverse because the Wisconsin Central, being operated on the credit of the Soo, had no unsecured general creditor except the Soo, whose unsecured claims and diversity of citizenship might be disputed.

"Whether there were sufficient precedents for the Wisconsin Central to petition for the receivership to protect its own properties, the conclusion being adverse.

"Whether the Trustees under the Wisconsin Central First General Mortgage had authority thereunder to petition for the receivership before the default on their bond interest which would not occur until January 1, 1933, the conclusion being adverse.

"Whether an owner of such bonds could petition for the receivership before the default in interest, the conclusion being

in the affirmative, provided the necessary diversity of citizenship existed.

"Whether a sufficient controversy would exist between such a bondholder and the Wisconsin Central, in advance of a default on his bonds, to give the Federal Court jurisdiction to appoint a Receiver, the conclusion being in the affirmative.

"Whether the Soo could properly intervene as a party plaintiff in support of such a bondholder's application, the conclusion being in the affirmative.

"Whether the primary jurisdiction should be in Wisconsin where the bulk of the properties were situated, or in Minnesota where the principal operating officers were situated, or in Illinois, and the comparative advantages or disadvantages to the Wisconsin Central of conducting the receivership in one or another of those jurisdictions.

"The nature and location of the ancillary proceedings which would be necessary.

"The effect of Sec. 56 of the Judicial Code [28 U.S.C.A. § 117] extending the jurisdiction of a District Court in receivership throughout the Circuit in which it is situated.

"In connection with the foregoing, numerous petitions, pleadings and orders previously used in other railroad receiverships were collected and analyzed; and petitioner and his associates compiled in tentative drafts the necessary matter to be alleged in the original plaintiff's bill of complaint and adopted in the Soo's petition as an intervening plaintiff.

"The above preparations extended from early in October, 1932, to November 29, 1932, and consumed not less than 425 hours of our time.

"Collaboration With Plaintiff's Counsel In Establishing This Receivership.

"On November 29th petitioner conferred with counsel for the plaintiff Northwest-

procurement of this receivership, but argues that such services by him were also in the interest of and for the benefit of the property of the Wisconsin Central. This concession is abundantly justified by the evidence. The Soo was vitally interested in the maintenance of the Wisconsin Central as a going concern under its operation because that road was the only connection of the Soo with two important terminals— Chicago and Milwaukee. Before the receivership, the Soo had a long-time lease upon this property giving it complete and exclusive rights to and responsibilities for maintenance and operation of the Wisconsin Central. It had acted thereunder for more than twenty-five years. Also, the Soo was "guarantor of, or jointly obligated to," the payment of interest on $15,816,000 of Wisconsin Central Mortgage Bonds. Also, the Soo had "a large block" of Wisconsin Central bonds. Also, the Soo owned a majority of the common capital stock of the Wisconsin Central "and has purchased or is obligated to pay for virtually the entire remainder of such common stock."

---

ern Fire & Marine Insurance Company, submitting the results of the foregoing preparation.

"On November 30th during the day and in the evening we conferred with plaintiff's counsel on the various questions involved and revisions of the papers to be used.

"On December 1st we spent the entire day until late at night on these matters in further conferences and revisions of papers.

"On December 2nd, petitioner's associates continued working on the papers and procuring their execution throughout the day.

"In the afternoon of December 2nd, when plaintiff's counsel appeared in this Court and submitted the bill of complaint praying for a receivership, petitioner appeared for the Soo as an intervening plaintiff and collaborated in explaining the entire plan and the questions involved. Thereupon the Court appointed the Receiver and authorized him to take possession of the Wisconsin Central properties and agree with the Soo to operate them temporarily as his agent with reimbursement for the deficits.

"That evening we collaborated with the plaintiff's counsel in preparing the necessary papers for ancillary proceedings in Illinois.

"On December 3rd petitioner and his associate appeared in the Federal Court in Chicago with the plaintiff's counsel and collaborated in explaining the matter to the Court and obtaining the necessary ancillary orders in Illinois.

"Petitioner's associate spent December 6th, 7th and 8th in going to and returning from Grand Rapids, Michigan, and collaborating with the plaintiff's counsel in presenting the situation to the Federal Court in Michigan and obtaining the necessary ancillary orders in that jurisdiction.

"The foregoing services from November 29, 1932, to December 8, 1932, consumed not less than 85 hours of our time.

"Cooperation With The Wisconsin Central Bondholders Respecting Their Intervention As Parties Plaintiff.

"In order to facilitate their intervention in this receivership, petitioner attended numerous conferences in New York with important Wisconsin Central bondholders and mortgage trustees and their counsel, wherein he explained that the receivership was necessary to avoid immediate non-operation of the Wisconsin Central properties; that the arrangement for the Soo to operate as the Receiver's agent was subject to termination whenever a better arrangement could be made; and that the Soo would cooperate in obtaining an authoritative interpretation of the lease of April 1, 1909, as to the Soo's right to discontinue meeting the Wisconsin Central deficits, to be followed by whatever retroactive adjustment of obligations might be appropriate.

"Petitioner thus cooperated respecting their intervention at a conference in New York in the morning of December 5, 1932, with the representatives of the mortgage trustees and their counsel and numerous important bondholders; a conference that afternoon with the counsel for the trustees under the First General Mortgage; a similar conference with said counsel in the morning of December 6th; conferences in the afternoon of December 6th with the representatives of Chicago University, Mutual Life Insurance Company and New York Life Insurance Company, as holders of Wisconsin Central bonds; and conferences on December 18th and 19th in New York with counsel for the first mortgage trustees.

"The above services from December 4, 1932, to December 20, 1932, consumed not less than 60 hours of petitioner's time.

"Services In Preparing A Stipulation Of Facts For The Intervening First Mortgage Trustees.

"In the petitions on which they intervened in this receivership, the First Mortgage Trustees raised the contention that

Also, it claimed an unsecured indebtedness "in excess of $50,000.00," against the Wisconsin Central.

The sole causes of this receivership were that the Soo declined further to meet operating deficiencies in its use of the Wisconsin and yet wished to continue the operation of the road in conjunction with its own properties and to protect its other interests therein. Until the Soo, and it alone, brought about the situation necessitating the receivership, all other parties interested in the property were entirely taken care of and their rights protected. Also, it appears that counsel for the plaintiff in the receivership suit (Northwestern Fire & Marine Insurance Company) and counsel for the intervening underlying mortgage bondholders have been compensated from the estate.

Services of this character were plainly for the vital interests of the Soo to meet a situation brought about by it, and they were within the employment of appellant as general counsel for the Soo. There is no basis for the contention that there is a legal right to payment for such services from the estate. At most, there was a power in the court to make such allowance, but this power involved the exercise of the sound discretion of the court. We see no reason for disturbing the result of the exercise of that discretion here.

### II. The Tax Controversy.

Most of the trackage and property of the Wisconsin was in the state of Wisconsin. The Soo had trackage and property within that state. For many years prior to the receivership, the Wisconsin's and the Soo's taxes in Wisconsin had been assessed together in one single combined assessment made in the name of the Soo. The receivership began December 3, 1932. Early in 1933, both the receiver and the Soo made demands upon the Wisconsin Tax Commission for a separation of the assessments for the tax year 1933. However, the commission made a combined valuation at what both railways deemed a greatly excessive amount. The assessment was in the name of the Soo, but the properties of both were subjected thereby to the lien of the entire tax. As a foundation for obtaining proper valuation reductions for each property, it was thought necessary to obtain a decree setting aside the combined assessment and compelling the commission to make separate assessments. Because the Wisconsin did not then have funds sufficient to tender the proper tax on its property and because the separation could be adequately accomplished by a suit by the Soo, the Soo (after discussion with counsel for the receiver) brought the action. This action finally resulted in the desired decree for separation of assessments. Minneapolis, St. P. & S. S. M. Ry. Co. v. Henry, State Treasurer, 215 Wis. 668, 255 N.W. 896. Other litigation by the State Attorney General to sell the properties of both roads to pay the 1933 tax so assessed and by the Soo to test a similar combined assessment for 1934 were held in abeyance and were governed by the above decision.

After the separation of assessments was thus secured, the commission made the separate assessment merely by a percentage division between the two roads of the combined amounts theretofore assessed against

the lease of April 1, 1909, gave the Soo no right to discontinue using its own funds to meet the Wisconsin Central deficits; wherefore they claimed that the Receiver should not have agreed, as he did in the Operating Agreement, to reimburse the Soo for the deficits it incurred in operating the Wisconsin Central as his agent.

"In order to facilitate the Court's interpretation of the lease, petitioner offered to the counsel for the intervening trustees, and they accepted, his services in preparing for them a stipulation of the facts which they wished to submit to the Court to sustain their interpretation. This stipulation included the ultimate details of transactions between the Soo and the Wisconsin Central for 23 years from 1909 to 1932; the manner in which the Wisconsin Central had been operated by the Soo during that period; and its available facilities as to equipment, terminals, etc., for independent operations. Preparation of this stipulation necessitated much research into the corporate records; many conferences with executives; operating and accounting officers; numerous discussions and considerable correspondence with counsel for the intervening trustees. This stipulation was introduced in evidence by counsel for the intervening trustees; facilitated the Court's decision as to how the lease should be construed; and saved the estate the expense of taking testimony for many days.

"Our services in preparing that stipulation from April 6, 1933, to May 15, 1933, consumed not less than 175 hours of our time."

the Soo for the respective years 1933 and 1934. Then, appellant proposed to apply for reductions of the separate assessments of the Soo and the counsel for the receiver requested him to make similar showings for reductions of the Wisconsin properties. Appellant prepared a brief supported by thirty tables—some applying to the Wisconsin property and some to the Soo property. Appellant presented an oral argument supporting the claimed reductions for both roads. There was some participation by counsel for the receiver, but the major service was by appellant in this reduction proceeding. The results were substantial reductions as to both properties in the same percentages. The Soo agreed to pay upon this reassessment.

The receiver contested for further reductions. Negotiations between the taxing authorities and the receiver and his counsel —participated in by appellant—led to further reductions in the form of a compromise agreement. This agreement was repudiated by the state authorities and thereafter ensued a lively contest including an attempt to enforce payment of the taxes as reduced by the commission, a proceeding to forfeit the Wisconsin corporate charter, and an attempt to pass a congressional act allowing States to enforce state tax collection remedies against property in federal receivership. The ultimate result was payment of the commission assessments in principal amounts with interest and penalties waived as to the 1933 and 1934 taxes and some reduction in principal of the 1932 taxes.

The above is intended only as a bare outline of this tax situation, but is sufficient for the purposes of this opinion.

Throughout this controversy, the Soo had a direct interest. Up to the point where there was a segregation of the taxes, it had the interest of ascertaining what taxes were to be assessed against it. After segregation (as well as before), it was directly interested in the amount of taxes assessed against the Wisconsin Central because of its large interests as a stockholder, bondholder, unsecured creditor, and guarantor of interest on some of the bonds—to reduce the taxes would directly affect the net income from this property and, therethrough, all of the above interests.

It is true that there may have been some other stockholder interests and there were other substantial secured creditor interests

which would benefit, along with the Soo's similar interests, from the separation of the assessments, and, particularly, from the reduction of the assessments and the taxes. However, there was another interest of the Soo which was peculiar to it and more important to it than its stockholder and creditor interests. That interest was the vital necessity of controlling the exclusive operation of the Wisconsin property in connection with its own property. Without such control, the Soo would have no entrance into the essentially important rail terminal of Chicago. For the Soo to control operation of the Wisconsin under an arrangement whereby the Wisconsin should pay its own way was an ideal arrangement for the Soo. In lessening taxes of the Wisconsin, that line was more nearly assured self-support. In preventing forfeiture of the corporate charter of the Wisconsin and in preventing sale of its property to pay taxes, the Soo was secured in its control of operation which either of these eventualities might have entirely defeated. It was vital to the Soo to operate the Wisconsin under the long-term lease. When operation under the lease became burdensome, it was equally vital to the Soo to continue such operation under the operating agreement with the receiver. This vital interest, peculiar to the Soo, was the main spring which moved the counsel of the Soo in these tax matters. It was enough, standing alone, to justify and compel his able action to protect the Wisconsin. To protect the Wisconsin was to protect the Soo.

In all that appellant did in this tax controversy, he was directly and primarily serving important interests of the Soo.

It is true that, in so far as his services were directed to reducing the assessment of the Wisconsin Central, he was also benefiting the estate. However, the receiver had his own counsel who were active in this controversy. If appellant expected compensation from the estate, he should have applied to the court for recognition of such services and had his status established before or during the services. Such action would have fixed his right to such compensation. On the contrary, the first notice of his belief that the estate owed him any compensation came with the filing of this petition for allowance of fees, on December 16, 1935, after rendition of such services. Without such action before service rendered, his claim for compensation cannot be a right, but must, at most, rest in the discretion of

the court. The court has exercised that discretion against him, and we see no reason to hold such exercise an abuse of discretion.

■ The second reason stated by the court was that the service in connection with taxes was within the services covered by the operating agreement. This agreement was designed to continue the uninterrupted operation of the property by the Soo. It was approved and put in force immediately after appointment of the receiver. It provided that the Soo was appointed as the agent and representative of the receiver and that it was "to operate and maintain said properties in behalf of the receiver on the operating and maintenance basis provided in such lease and the schedule hereto attached, said Railway Company to collect the revenues of such properties and apply the same in discharge of the costs of the operation and maintenance thereof, including taxes and assessments, allocating to the costs of such operation and maintenance all directly assignable costs and apportioning costs not so directly assignable on the basis of said schedule hereto attached." Monthly, the Soo was to pay over to the receiver any net credit balance and was to be reimbursed by the receiver for any deficit. In the "schedule" (attached to and a part of this operating agreement), which set forth the method of allocating many kinds of specified expense, were items which admittedly covered the salary of appellant as general counsel of the Soo. The allocation required by these items corresponded, in general, to the respective ratios of volume of business—the Wisconsin Central share being about 40 per centum. This percentage the receiver regularly paid.

Appellant contends that these tax services were not within the above employment because they were "extraordinary." The agreement expressly charged the Soo with the duty to pay "taxes and assessments" so long as it could do so from the earnings of the Wisconsin Central. It would seem to be its related duty to keep the taxes as low as possible. The operation and maintenance of the property by the Soo was as the agent of the receiver. The receiver was entitled to net earnings. It would seem to be the duty of the agent to avoid all unnecessary expense and, to that end, resist any unfair or unjust charge—whether for taxation or otherwise. Such action would, naturally, be taken by an owner to protect his own property, and it should be equally taken by an agent acting under the broad powers and in the situation here. The Soo, as well as the Wisconsin Central, had a very real interest in the reduction of these taxes. Nor is the overassessment of railroad property —at least in the judgment of those interested therein—at all unusual. It is one of those things often to be expected. Ordinarily, opposition to such involves legal services. The tax services here came within the duties of appellant as general counsel of the Soo and were compensated by his regular salary as such, 40 per centum of which was paid by the receiver.[3]

Conclusion.

The order should be and is affirmed.

[3] The law governing allowances from an estate for legal services of counsel for some party or parties has been repeatedly announced under a variety of situations. We have examined the following and other cases (including the state case citations in the briefs) without finding any right in appellant to compensation here or any abuse of discretion in denying such compensation here. Some of the cases cited below are under amendments to the Bankruptcy Act but such amendments, obviously, were following the existing equity practice in receiverships.

*Supreme Court:*—Shulman v. Wilson-Sheridan Hotel Co., 301 U.S. 172, 174, 57 S.Ct. 680, 681, 81 L.Ed. 986, rehearing denied 301 U.S. 714, 57 S.Ct. 921, 81 L. Ed. 1365; Watkins v. Sedberry, 261 U. S. 571, 575, 43 S.Ct. 411, 412, 67 L.Ed. 802; Randolph v. Scruggs, 190 U.S. 533, 538, 23 S.Ct. 710, 47 L.Ed. 1165; Louis-ville, Evansville & St. L. R. Co. v. Wilson, 138 U.S. 501, 506, 11 S.Ct. 405, 34 L.Ed. 1023; Hobbs v. McLean, 117 U.S. 567, 582, 6 S.Ct. 870, 29 L.Ed. 940; Central Railroad & Banking Co. of Ga. v. Pettus, 113 U.S. 116, 124, 125, 126, 5 S.Ct. 387, 28 L.Ed. 915; Trustees v. Greenough, 105 U.S. 527, 531, 538, 26 L. Ed. 1157; Cowdrey v. Galveston, etc., R. Co., 93 U.S. 352, 354, 23 L.Ed. 950.

*This Court:*—West v. Fradenburg, etc., 86 F.2d 318; Teasdale v. Sefton Nat. Fibre Can Co., 85 F.2d 379, 107 A.L.R. 531; Wallace v. Fiske, 80 F.2d 897, 107 A.L.R. 726, certiorari denied Kleinschmidt v. Wallace, 298 U.S. 675, 56 S.Ct. 940, 80 L.Ed. 1397; Morse & Tyson v. Irving-Pitt Mfg. Co., 18 F.2d 692; Culhane v. Anderson, 17 F. 2d 559; Hutchinson Box Board & Paper Co. v. Van Horn, 299 F. 424; Priest v. Wells, 282 F. 57; Mecartney v. Guardian Trust Co., 280 F. 64; Mechanics-

American Nat. Bank v. Coleman, 204 F. 24; Gillespie v. J. C. Piles & Co., 178 F. 886, 44 L.R.A.,N.S., 1; McCourt v. Singers-Bigger, 145 F. 103, 7 Ann.Cas. 287; Frank v. Dickey, 139 F. 744.

*First Circuit:*—National City Bank v. Saldana Crosas Realty Corp., 86 F.2d 923, 924; Turner v. Woodard, 259 F. 737, 746.

*Second Circuit:*—In re Nine North Church St., 89 F.2d 13, certiorari denied Glass & Lynch v. Nine North Church St., 58 S.Ct. 29, 82 L.Ed. —; In re Paramount Publix Corp., 85 F.2d 588, 590, 591, 592, certiorari denied Palmer v. Paramount Pictures, Inc., 300 U.S. 655, 57 S.Ct. 432, 81 L.Ed. 865; In re Paramount Publix Corp., 85 F.2d 592, certiorari denied Palmer v. Paramount Pictures, Inc., 300 U.S. 655, 57 S.Ct. 432, 81 L.Ed. 865; In re Paramount Publix Corp., 85 F.2d 593, 594, certiorari denied Zirn v. Paramount Pictures, Inc., 300 U.S. 656, 57 S.Ct. 432, 81 L.Ed. 865; In re Paramount Publix Corp., 85 F.2d 595; In re Paramount Publix Corp., 85 F.2d 596; In re Paramount Publix Corp., 85 F.2d 597; In re Consolidated Motor Parts, 85 F.2d 579, 581; In re Paramount Publix Corp., 83 F.2d 408; In re New York Investors, Inc., 79 F. 2d 182, 186; In re Realty Associates Securities Corp., 69 F.2d 41, certiorari denied Bondholders' Committee v. Realty Associates Securities Corp., 292 U.S. 628, 54 S.Ct. 631, 78 L.Ed. 1482; In re Consolidated Factors Corp., 59 F.2d 193, 194; In re Eureka Upholstering Co., 48 F.2d 95; Nolte v. Hudson Nav. Co., 47 F.2d 166, 167, 168; In re Diamond Fuel Co., 6 F.2d 773; In re Consolidated Distributors, Inc., 298 F. 859, 862; American Engineering Co. v. Metropolitan By-Products Co., 275 F. 40, 42; Central Trust Co. v. U. S. Light & Heating Co., 233 F. 420, 421; In re Medina Quarry Co., 191 F. 815, 816.

*Third Circuit:*—In re Starrett Corp., 92 F.2d 375; Brown v. Pennsylvania R. Co., 250 F. 513, 524, certiorari denied 248 U.S. 558, 39 S.Ct. 6, 63 L.Ed. 420; Haehnlen v. Drayton, 192 F. 300, 306.

*Fourth Circuit:*—Buford v. Tobacco Growers' Co-op. Ass'n, 42 F.2d 791, 792; Carbon Steel Co. v. Slayback, 31 F.2d 702, 705; Burroughs v. Toxaway Co., 185 F. 435, 440.

*Fifth Circuit:*—Straus v. Baker Co., 87 F.2d 401, 407, 408, 409, 410, rehearing, 89 F.2d 322, 324; First Nat. Bank v. Southern Cotton Oil Co., 86 F.2d 33; Snell v. Frank Snell Sawmill Co., 284 F. 847; Id., 261 U.S. 619, 43 S.Ct. 364, 67 L.Ed. 830; Huff v. Bidwell, 195 F. 430, certiorari denied Hall v. Huff, 227 U.S. 677, 33 S.Ct. 328, 57 L.Ed. 700; Lamar v. Hall & Wimberly, 129 F. 79, 82, 83; Weed v. Central of Georgia Ry. Co., 100 F. 162, 164, 166, 167; Burden Central Sugar-Refining Co. v. Ferris Sugar-Mfg. Co., 87 F. 810, 811; Farmers' Loan & Trust Co. v. Green, 79 F. 222, 224, 226, certiorari denied 166 U.S. 720, 17 S.Ct. 994, 41 L.Ed. 1187; Petersburg Sav. & Ins. Co. v. Dellatorre, 70 F. 643, 645; Jacksonville, T. & K. W. Ry. Co. v. American Const Co., 57 F. 66, 69.

*Sixth Circuit:*—Williams v. Great Lakes Terminal Warehouse Co., 87 F.2d 115, certiorari denied 301 U.S. 710, 57 S. Ct. 942, 81 L.Ed. 1364; In re Memphis St. Ry. Co., 86 F.2d 891, 894; Calhoun v. Stratton, 61 F.2d 302; In re Kinnane Co.'s Estate, 242 F. 769, 775; In re Stearns Salt & Lumber Co., 225 F. 1, 4; In re Roadarmour, 177 F. 379; Central Trust Co. v. Condon, 67 F. 84, 110.

*Seventh Circuit:*—In re Central Shorewood Bldg. Corp., 90 F.2d 725, 727; In re T. L. Smith Co., 83 F.2d 665; In re Grocery Center, 83 F.2d 617; In re National Lock Co., 82 F.2d 600, 605, certiorari denied National Lock Co. v. Rosengard, 299 U.S. 562, 57 S.Ct. 25, 81 L. Ed. 414; In re A. Herz, Inc., 81 F.2d 511, 512, 513; In re Marcuse & Co., 11 F.2d 513; Linen Thread Co. v. A. Booth & Co., 192 F. 515, 517; Guaranty Trust Co. v. Chicago Rys. Co., 185 F. 411, 415; Id., 220 U.S. 616, 31 S.Ct. 720, 55 L.Ed. 611; In re Curtis, 100 F. 784, 785, certiorari denied Wilson v. Dunseth, 179 U.S. 683, 21 S.Ct. 916, 45 L.Ed. 385; In re Sheridan-Melrose Bldg. Corp., 86 F.2d 2.

*Ninth Circuit:*—Crump v. Ramish, 86 F.2d 362, 363; Oakland Hotel Co. v. Crocker First National Bank, 85 F.2d 959.

*Tenth Circuit:*—Clarke v. Hot Springs Electric Light & Power Co., 76 F.2d 918, certiorari denied 296 U.S. 624, 56 S.Ct. 147, 80 L.Ed. 443; In re Otto-Johnson Merc. Co., 48 F.2d 741.