# CENTRAL RAILROAD & BANKING COMPANY OF GEORGIA *v.* PETTUS & Others.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA.

Argued April 14, 15, 1884.—Decided January 5, 1885.

Certain unsecured creditors of a railroad company in Alabama instituted proceedings in equity, in a court of that State, on behalf of themselves and of all other creditors of the same class who should come in and contribute to the expenses of the suit, to establish a lien upon the property of that company in the hands of other railroad corporations which had purchased and had possession of it. The suit was successful, and the court allowed all unsecured creditors to prove their claims before a register. Pending the reference before the register the defendant corporations bought up the claims of complainants, and other unsecured creditors. Thereupon the solicitors of complainants filed their petition in the cause to be allowed reasonable compensation in respect of the demands of unsecured creditors (other than their

immediate clients), who filed their claims under the decree, and to have a lien- declared therefor on the property reclaimed for the benefit of such creditors. The suit between the solicitors and such defendant corporations was removed to the Circuit Court of the United States: *Held—*

(1) Within the principle announced in *Trustees* v. *Greenough,* 105 U. S. 527, the claim was a proper one to be allowed.

(2) It was, also, proper to give the solicitors a lien upon the property brought under the control of the court by the suit and the decree therein, such lien being authorized by the law of Alabama.

(3) That under the circumstances of this case the amount allowed by the court below was excessive.

This was an appeal from a decree of the Circuit Court of the United States for the Middle District of Alabama in favor of the appellees—Pettus & Dawson and Watts & Sons—adjudging them entitled to the sum of $35,161.21, and interest thereon at eight per cent. per annum from March 7, 1881, with lien, to secure its payment, upon the road-bed, depots, side tracks, turnouts, trestles, and bridges owned and used by the appellants—corporations of the State of Georgia—in operating the railroad formerly belonging to the Montgomery and West Point Railroad Company, an Alabama corporation, and which extends from Montgomery to West Point, with a branch from Opelika to Columbus. This property was directed to be exposed to sale, unless, within a given time, the said amount was paid.

This suit was the outgrowth of certain litigation in the courts of Alabama relating to the before-mentioned and other railroad property, in which the appellants were interested. A statement of its history is necessary to a clear understanding of the questions now presented for determination.

On the 1st of September, 1870, the Western Railroad Company, an Alabama corporation, purchased and took possession of the railroad (main line and branch) and all other property of the Montgomery and West Point Railroad Company,—one of the terms and conditions of such purchase being, as was claimed, that the former company assumed the payment of all outstanding debts and obligations of the latter, and agreed to issue its capital stock, dollar for dollar, in exchange for stock of the Montgomery and West Point Railroad Company out-

standing. It was a part of that arrangement that the last named company should, as it subsequently did, surrender its charter to the State.

When this purchase was made there were, upon the franchises and property of the latter company, two mortgages to secure bonds proposed to be issued; one, June 6, 1866, for $750,000, bonds for the whole of which were issued; the other, May 1, 1868, for $400,000, bonds for $45,000 of which were issued. It had also outstanding bonds issued in 1866 and 1867, not secured by mortgage or otherwise. The Western Railroad Company had, at the time of its purchase, a mortgage, of date September 15, 1868, upon its own property and franchises, to secure $600,000 of bonds then, or at some subsequent period, guaranteed by the present appellants.

On the 15th of September, 1870, that company executed to Morris and Lowery, trustees, a mortgage upon its property and franchises, (including the property transferred to it by the Montgomery and West Point Railroad Company,) to secure the payment of $1,200,000 of bonds, thereafter to be issued—and of which a large amount was issued—and their payment was also guaranteed by the appellants.

Subsequently, on March 31, 1874, those trustees commenced a suit in the Chancery Court of Montgomery County, Alabama, against the Western Railroad Company, the present appellants; the surviving trustees in the mortgages executed by the Montgomery and West Point Railroad Company; and others. Its object was to procure a sale of the property of the former company, including that purchased from the latter company. A final decree was passed December 18, 1874, ordering a sale, subject, however, to a lien, in respect of the property formerly owned by the last named company, in favor of the holders of its mortgage bonds, according to their respective priorities; and, in respect of the property of the Western Railroad Company, to a lien in favor of the holders of bonds secured by its mortgage of September 15, 1868. The sale was had—the present appellants becoming the purchasers.

On the 8th of May, 1875, Branch, Sons & Co., H. P. Hoadley, and C. S. Plank—holding bonds of the (old) Montgomery

and West Point Railroad Company, not secured by mortgage —through Pettus & Dawson and Watts & Sons, their solicitors, exhibited a bill in equity in the same court, against the present appellants, the Western Railroad Company, the Montgomery and West Point Railroad Company, and others. They sued for themselves as well as for all other creditors of the last named company who should come in and make themselves complainants and contribute to the expenses of the suit. Such proceedings were had—the Georgia corporations appearing and making defence—that, on the 1st day of May, 1877, a final decree was entered, by which it was, among other things, adjudged that "the unsecured creditors of the Montgomery and West Point Railroad Company, to which class complainants belong, have a lien" upon the property transferred by it to the Western Railroad Company; that such lien was subordinate to those for the bonds issued under the several mortgages executed by the Montgomery and West Point Railroad Company that were outstanding and unpaid, but superior to that of the mortgage executed by the Western Railroad Company after its said purchase, so far as the property of the Montgomery and West Point Railroad Company was covered by that mortgage; and that the property of all kinds, belonging to the latter company, be sold to satisfy its debts according to priority.

The cause was referred to a register to ascertain and report the amounts due to the complainants, and to such other unsecured creditors of the Montgomery and West Point Railroad Company as should prove their claims pursuant to the decree: also, the amounts due to holders of bonds issued under its several mortgages. Upon appeal by the two Georgia corporations to the Supreme Court of Alabama, that decree was affirmed. The register thereafter proceeded with its execution. Numerous parties, including the complainants, appeared before him and had their claims registered, the creditors in each instance retaining in their own custody the evidence of their respective demands. The aggregate amounts of such claims was very large.

On the 15th of April, 1879, the register not having made his

report upon these claims, Pettus & Dawson and Watts & Sons, by leave of the court, filed in the cause their joint petition, alleging, in substance, that, as solicitors specially employed by the complainants, Branch Sons & Co., Hoadley, and Plank, they prepared and filed the original bill, as well in behalf of themselves as of all other unsecured creditors of the Montgomery and West Point Railroad Company who should come in and contribute to the expenses of the suit; conducted the proceedings to a final decree; represented the same interests in the Supreme Court of Alabama; that their relations to the suit were well known to the Georgia corporations during the whole period of the litigation; that pending the reference before the register, after the rights of complainants and all creditors of the same class had been established by the final decree, those corporations made a secret arrangement with their immediate clients, whereby the claims of the latter were paid in full, principal and interest, and whereby, also, Branch, Sons & Co., and their co-complainants, agreed to withhold from their solicitors the fact of such settlement until the Georgia corporations could buy or settle all other claims of the unsecured creditors of the Montgomery and West Point Railroad Company; that "afterwards said two Georgia companies, defendants to this suit, did buy up or settle the other claims, which had been filed in the cause, under said decree," and, "either jointly or separately, thereby acquired possession and control of said claims so filed;" that they, also, purchased and settled a large amount of claims, which might have been, but were not, filed with the register; that, at the time of such purchases, said Georgia corporations had actual notice that petitioners, as solicitors in that suit, claimed reasonable compensation for such services as they rendered in behalf of the unsecured creditors of the Montgomery and West Point Railroad Company (other than complainants) who should come in and take the benefit of the final decree, and, also, the benefit of any lien upon said property that should be declared in favor of those creditors; and that in equity they "were the assignees of a part of each claim as filed to the amount of the reasonable value of the services rendered in said cause by petitioners for the benefit of each holder and owner of

such claims respectively." The prayer of the petition was, that an account be taken of the sums thus due to them as solicitors representing the unsecured creditors of the Montgomery and West Point Railroad Company (except the complainants and other named creditors with whom they had special contracts for fees), who received the benefit of their services ; that they be declared to have a lien for the value of such services on all the property of that company, which had come into the possession of the Georgia corporations ; and that so much of it as may be necessary for that purpose be sold to meet the amounts due them.

The register reported, on the 22d of April, 1879, that there were then no bonds or claims in the registry, except one claim, filed in court, as to which he did not report because no one had appeared and requested that it be audited.

Subsequently, April 24, 1879, the Georgia corporations presented their joint petition for the removal of the suit commenced against them by Pettus & Dawson and Watts & Sons—they being the only defendants to the petition filed by the latter—to the Circuit Court of the United States, in which court it was docketed, see 3 Woods, 620, and, after answer by the defendants and proof taken, proceeded to final decree. When the cause was removed from the State court nothing practically remained for determination between the parties to the record, except the claim of appellees, citizens of Alabama, to a lien upon the property in question, owned by the two Georgia corporations.

*Mr. H. C. Semple* and *Mr. A. R. Lawton* for appellants cited *Thompson* v. *Cooper*, 2 Colby, 87 ; *Trustees* v. *Greenough*, 105 U. S. 527 ; *Stanton* v. *Hatfield*, 1 Keene, 361 ; *Nave* v. *Weston*, 3 Atk. 557 ; *Mason* v. *Codwise*, 6 Johns. 300 ; *Thompson* v. *Brown*, 4 Johns. 637 ; *Pascal's Case*, 10 Wall. 483 ; *Grimball* v. *Cruse*, 70 Ala. 544 ; *Roselius* v. *Delachaise*, 5 La. Ann. 481.

*Mr. W. L. Bragg* for appellees cited *Trustees* v. *Greenough*,

105 U. S. 527 : *Stanton* v. *Hatfield*, 1 Keene, 371–3 ; *Nave* v. *Weston*, 3 Atk. 557 ; *Hunt* v. *McClanahan*, 1 Heisk. 503 ; *Warfield* v. *Campbell*, 38 Ala. 527, 531–2 ; *Andrews* v. *Morse*, 12 Conn. 444 ; *Ex parte Lehman, Durr & Co.*, 59 Ala. 631 ; *Wyley* v. *Cox*, 15 How. 415 ; *Carter* v. *Bennett*, 6 Florida, 214, 257–8 ; *Martin* v. *Hawks*, 15. Johns. 405 ; *Ex parte Plitt*, 2 Wall. Jr. 453 ; *Bradt* v. *Koon*, 4 Cowen, 416 ; *Mumma* v. *Potomac Co.*, 8 Pet. 281 ; *Montgomery & West Point Railroad Co.* v. *Branch*, 59 Ala. 139 ; *VanMeter Ex'rs* v. *VanMeter*, 3 Gratt. 148, 162 ; *Dargan* v. *Waring*, 11 Ala. 988 ; *Brown* v. *Bigley*, 3 Tenn. Ch. 618.

Mr. Justice Harlan delivered the opinion of the court. He recited the facts as above stated, and continued :

In *Trustees* v. *Greenough*, 105 U. S. 527, we had occasion to consider the general question as to what costs, expenses and allowances could be properly charged upon a trust fund brought under the control of court by suits instituted by one or more persons suing in behalf of themselves and of all others having a like interest touching the subject-matter of the litigation. That suit was instituted by the holder of the bonds of a railroad company, on behalf of himself and other bondholders, to save from waste and spoliation certain property in which he and they had a common interest. It resulted in bringing into court or under its control a large amount of money and property for the benefit of all entitled to come in and take the benefit of the final decree. His claim to be compensated, out of the fund or property recovered, for his personal services and private expenses was rejected as unsupported by reason or authority. " It would present," said Mr. Justice Bradley, speaking for the court, " too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interests of creditors, and that, perhaps, only to a small amount, if they could calculate upon the allowance of a salary for their time and having all their private expenses paid." In respect, however, of the expenses incurred in carrying on the suit and reclaiming the property subject to the trust, the rule, upon a careful review of the authorities, was held to be differ-

ent.  After stating it to be a general principle that a trust estate must bear the expenses of its administration, and that where one or more of many parties having a common interest in a trust fund takes, at his own expense, proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement either out of the fund itself or by a proportional contribution from those who accept the benefit of his efforts, the court said that "the same rule is applicable to a creditor's suit where a fund has been realized by the diligence of the plaintiff." It was consequently held that the complainant in that case was properly allowed his reasonable costs, counsel fees, charges and expenses incurred in the fair prosecution of the suit, and in reclaiming and rescuing the trust fund and causing it to be subjected to the purposes of the trust.  Are the principles announced in that case applicable to the one now before us?

We have seen that the purchase, by the Western Railroad Company of the property of the Montgomery and West Point Railroad Company, and the surrender by the latter of its charter, left the unsecured creditors of the vendor company unprovided for, except as the vendee company assumed and agreed to meet the outstanding debts and obligations of the other company.  But when the present appellants became purchasers at the sale in the suit instituted by Morris and Lowery, trustees, they asserted their right to hold the property, originally belonging to the Montgomery and West Point Railroad Company, freed from any claim against it by the unsecured creditors of that company. Those creditors resided in several States, and their claims aggregated a large amount.  Co-operation among them was impracticable.  If some did not move, the interests of all would have suffered.  Hence Branch, Sons & Co. and their co-complainants instituted suit for the benefit of themselves and other creditors of the same class.  They, and their solicitors, bore the entire burden of the litigation until the lien was finally declared, and the property ordered to be sold to pay all claims filed pursuant to the decree.  The Supreme Court of Alabama held—conclusively as between the parties before it—that the Montgomery and West Point Railroad Company, like any other

private corporation chartered to transact business, was a trustee of its capital, property and effects, first, for the payment of its creditors, and afterwards for the benefit of its stockholders; that while it was in operation, according to the design of its charter, its general creditors would have no specific lien, entitling them to sue in equity; yet, having left its debts unpaid, and having distributed its capital, property, and effects among its stockholders, or transferred them to third persons who were not *bona fide* purchasers without notice, and having become disorganized so that it could not be efficiently sued at law, "a court of equity will pursue and lay hold of such property and effects, and apply them to the payment of what it owes to its creditors;" and, consequently, that its creditors had a lien, for the payment of their debts, on its road, appurtenances, and other property, superior to that created by the trust deed or mortgage of September 15, 1870, executed by the Western Railroad Company. *Montgomery & West Point Railroad Co.* v. *Branch*, 59 Ala. 139.

It thus appears that by the suit instituted by Branch, Sons & Co. and others, the property was brought under the direct control of the court to be administered for all entitled to share the fruits of the litigation. Indeed, the suit itself was an equitable levy upon the property, and the lien arising therefrom remained until discharged by order of the court. It is true that the bill states that it was brought for the benefit of all creditors who should become complainants therein. But it was intended to be, and throughout was, conducted as a suit for the benefit, not exclusively of the complainants, but of the class to which they belonged. It was so regarded by all connected with the litigation.

It is clear that within the principles announced in *Trustees* v. *Greenough*, Branch, Sons & Co. and their co-complainants are entitled to be allowed, out of the property thus brought under the control of the court, for all expenses properly incurred in the preparation and conduct of the suit, including such reasonable attorney's fees as were fairly earned in effecting the result indicated by the final decree. And when an allowance to the complainant is proper on account of solicitors' fees, it

may be made directly to the solicitors themselves, without any application by their immediate client.

But, on behalf of appellants, it is insisted that the utmost which the court may do is to charge upon the property such reasonable expenses as complainants themselves incurred, and became directly and personally bound to meet; and, since appellees have received from the creditors, specially engaging their services, all that those creditors agreed to pay, it cannot be said that the compensation demanded in respect of such as were not parties, otherwise than by filing their claims with the register, constitute a part of the expenses incurred by the complainants. This is an aspect of the general question not presented in *Trustees* v. *Greenough.*

It is true that the complainants are not shown to have incurred any personal responsibility for solicitors' fees beyond those stipulated, by special contract, to be paid to the appellees; and it is equally true that there was no express contract, on their part, to pay appellees such additional compensation as the court might allow and charge upon the property. Yet it is proven that when the appellees engaged their professional services to Branch, Sons & Co., and other complainants named in the bill, it was understood by the latter that their solicitors entered upon the preparation of the suit in the belief that they had the right to demand, and would demand, such additional compensation as was reasonable, in respect of unsecured creditors who accepted the fruits of their labors by filing claims; that, but for this understanding, appellees would have stipulated for larger compensation than was agreed to be paid by their particular clients; and that, in this belief and upon that understanding, they conducted the suit. Mr. Watts, in his deposition, says that on the occasion of his contract for a fee with Branch, he "stated to him that the bill which we should file, although it should be in the name of his firm, would be for the benefit of all the creditors of the Montgomery and West Point Railroad Company not secured by mortgage; and that in such cases the lawyer who filed the bill would be entitled to a fee from all the creditors who participated in the benefit of their labors; and that we should charge him so small a fee, with the

expectation that we should be paid a large fee out of the fund brought into court or condemned by our labors; and that such fee would be allowed by order of the Chancery Court, and a lien declared on the fund for the payment of such compensation; and with such understanding the paper [special contract for fee] was signed." Mr. Pettus says: "The bonds and other claims on which the bill was filed were less than a sixth of the unsecured debts of the Montgomery and West Point Railroad Company of the same class, and at the time that Pettus & Dawson were employed to bring the suit, that fact was known and discussed between the parties making the contract, and it was also discussed between said parties that the suit, if successful, would inure to the benefit of all the unsecured creditors who might claim the benefit of the decree, and that everybody who claimed the benefit of the services rendered by the complainants' solicitors would be bound to allow complainants' solicitors compensation out of that part of the fund distributable to them." There is no evidence in contradiction of these statements. Had Branch, Sons & Co., and their co-complainants, expressly stipulated to make such reasonable compensation, in addition to the fees they agreed to pay their solicitors, as the court might allow, in respect of other creditors filing claims, the case, it could not well be doubted, would come within the very letter of the decision in *Trustees* v. *Greenough*. Without at all conceding that an express contract of that character would have added to the power of the court in the premises, it seems to us that the present case is embraced by the reason of the rule announced in *Trustees* v. *Greenough*. When the litigation was commenced, the unsecured bonds of the Montgomery and West Point Railroad Company were without any value in the financial market. That litigation resulted in their becoming worth all, or nearly all, that they called for. The creditors who were entitled to the benefit of the decree had only to await its execution in order to receive the full amount of their claims; and that result was due to the skill and vigilance of the appellees, so far as the result of litigation may, in any case, be referred to the labors of counsel. When creditors filed their claims they had notice, by the bill, that the suit

was brought, not exclusively for the benefit of the complainants therein, but equally for those of the same class who should come in and contribute to the expenses of the litigation. Those expenses necessarily included reasonable counsel fees, which, upon every ground of justice, should be estimated with reference as well to the claims of the complainants who undertook to protect the rights of all the unsecured creditors, as of the claims of those who accepted the fruits of the labors of complainants and their solicitors. We are of opinion that the appellees are entitled to reasonable compensation for their professional services in establishing a lien, in behalf of the unsecured creditors of the Montgomery and West Point Railroad Company, upon the property described in the suit instituted by Branch, Sons & Co. and others; and that such compensation should be made with reference to the amount of all claims filed in the cause, although the evidence thereof may have been retained in the custody of the respective creditors; excepting from such estimate or calculation not only the claims of the complainants named in the bill, and of other unsecured creditors who may have had special contracts with appellees, or settled with them, but, also, such claims purchased by appellants as were not filed for allowance under the decree. The decree below proceeded upon this basis.

The court below did not err in declaring a lien upon the property in question, to secure such compensation as appellees were entitled to receive; for according to the law of Alabama, by one of whose courts the original decree was rendered, and by which law this question must be determined, an attorney-at-law, or solicitor in chancery, has a lien upon a judgment or decree obtained for a client to the extent the latter has agreed to pay him ; or, if there has been no specific agreement for compensation, to the extent to which he is entitled to recover, viz., reasonable compensation, for the services rendered. *Ex parte Lehman, Durr & Co.*, 59 Ala. 631 ; *Warfield* v. *Campbell*, 38 Ala. 527. That lien could not be defeated by the corporations which owned the property purchasing the claims that were filed by creditors under the decree. The lien of the solicitor rests, by the law of that State, upon the basis that he is to be regarded as

an assignee of the judgment or decree, to the extent of his fees, from the date of its rendition. This right of the solicitors is superior to any which the defendant corporations acquired, subsequent to the decree, by the purchase of the claims of unsecured creditors.

It remains only to consider whether the sum allowed appellees was too great. We think it was. The decree gave them an amount equal to ten per cent. upon the aggregate principal and interest of the bonds and coupons filed in the cause, excluding those in respect of which there was, between appellees and complainants and others, special contracts for compensation. It is shown that appellees had with the complainants contracts for small retainers and five per cent. upon the sums realized by the suit. We perceive no reason for this discrimination against creditors who were not parties except by filing their claims after decree. One-half the sum allowed was, under all the circumstances, sufficient.

For the error last mentioned

*The decree is reversed and the cause remanded, with directions to modify the decree so as to award to appellees only the sum of $17,580, with interest from March 7, 1881, with the benefit of the lien upon the property as established by the decree. Each party will pay his costs in this court, and one-half the cost of printing the record.*