On review of Special Master's Findings and Recommendations on Attorney Fees, attorney fees and costs ordered October 11, 2007

Richard STRUNK,
Donald Reed, Carol Booker, Larry Blumenstein,
Alan Lively, Merlene Martin, William Smee,
Denise Jacobsen, and Susanna Rhodes,
*Petitioners,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
State of Oregon, State of Oregon by and through the
State Board of Higher Education,
North Douglas School District,
Deschutes County, Portland School District,
City of Salem, South Lane School District,
and Oregon Health Sciences University,
*Respondents.*

Dave DAHLIN,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD
(Dawn Morgan, Janice Deringer, Mark Gardiner,
Jeanne Garst, Glenn Harrison, Todd Schwartz,
George Russell, Steven Bjerke),
Theodore Kulongoski, Governor,
State of Oregon,
*Respondents,*

*and*

LEAGUE OF OREGON CITIES
and Oregon School Boards Association,
*Intervenors.*

Martha SARTAIN,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
State of Oregon, and State of Oregon, by and through the
Oregon Department of Transportation,
*Respondents,*

*and*

# LEAGUE OF OREGON CITIES
## and Oregon School Boards Association,
### *Intervenors.*

(SC S50593 (Control); S50645; S50686)
(Cases Consolidated)

169 P3d 1242

Gregory A. Hartman, Michael J. Morris, and Aruna A. Masih, Bennett, Hartman, Morris & Kaplan, LLP, Portland, filed the petition for attorney fees and costs for petitioners Richard Strunk, Donald Reed, Carol Booker, Larry Blumenstein, Alan Lively, Merlene Martin, William Smee, Denise Jacobsen, and Susanna Rhodes.

Richard J. Birmingham, Birmingham, Thorson & Barnett, PC, Seattle, Washington, filed the petition for attorney fees and costs for petitioner Dave Dahlin.

Scott A. Jonsson, Brian R. Talcott, and James M. Hillas, Dunn, Carney, Allen, Higgins & Tongue, LLP, Portland, filed the petition for attorney fees and costs for petitioner Martha Sartain.

Townsend Hyatt, Joseph M. Malkin, *pro hac vice*, and Leah Spero, *pro hac vice* of Orrick, Herrington & Sutcliffe, LLP, San Francisco, California, filed the objection to attorney fees for respondent Public Employees Retirement Board.

Stephen S. Walters, Special Counsel, State of Oregon, and Jeremy D. Sacks, and Amy E. Edwards of Stoel Rives, LLP, Portland, joined the objections filed by Public Employees Retirement Board to petitions for attorney fees for respondents State of Oregon, State Board of Higher Education, Marion County, Oregon Department of Justice, Oregon Department of Transportation, Oregon Judicial Department, and Theodore Kulongoski.

William F. Gary, Sharon A. Rudnick, Jerome Lidz, and Karla Alderman, Harrang Long Gary Rudnick, PC, Eugene, filed the objections to petitions for attorney fees for respondents North Douglas School District, Deschutes County, Portland School District, City of Salem, South Lane School District, Oregon Health Sciences University, League of Oregon Cities, and Oregon School Boards Association.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This matter is before the court on three separate petitions for attorney fee awards.[1] In *Strunk v. PERB*, 338 Or 145, 108 P3d 1058 (2005) (*Strunk I*), petitioners successfully challenged certain aspects of the legislature's 2003 revision of the Public Employee Retirement System (PERS). Respondents there and in the matter now before us are the State of Oregon, the Public Employees Retirement Board, and a variety of nonstate government entities that include several different school districts, the City of Salem, Deschutes County, the League of Oregon Cities, and the Oregon School Boards Association. Petitioners subsequently sought attorney fees and, in *Strunk v. PERB*, 341 Or 175, 139 P3d 956 (2006) (*Strunk II*), this court concluded that petitioners were entitled to fees under the common fund doctrine. As a result, we referred the matter to a special master with instructions to make findings and recommendations regarding those fees. Having reviewed the special master's findings and recommendations, as well as the parties' objections and responses, we are now prepared to determine the respective attorney fee awards that should issue here.

In *Strunk II*, this court summarized the history of the fee matter now before us:

"In 2003, the Oregon Legislative Assembly modified the statutes that govern the Public Employees Retirement System (PERS). As relevant to petitioners' claims for relief, the amendments (collectively, the '2003 PERS legislation') altered the PERS statutes in several ways. Specifically, the 2003 PERS legislation (1) directed all employee-member salary contributions made after January 1, 2004, to an Individual Account Program, rather than to members' regular PERS accounts; (2) altered how PERS credited earnings to the accounts of members who joined PERS before January 1, 1996 ('Tier One' members); (3) prohibited, as of December 31, 2003, members from making further contributions to a variable annuity account program; (4) temporarily suspended cost-of-living adjustments (COLAs) for certain retired Tier One members; (5) permitted erroneously paid

---

[1] A fourth petition for fees—submitted by the parties previously identified in this matter as the Burt petitioners—was subsequently disposed of through a negotiated settlement. As a result, that fee request was not considered in the course of deciding this case.

and payable benefits to be recouped from future PERS fund earnings as an administrative expense; and (6) provided for the application of updated actuarial equivalency factors used to convert members' account balances at retirement to monthly payments.

"Petitioners, some active and some retired Tier One members, challenged the 2003 PERS legislation directly in this court pursuant to the legislature's grant of original jurisdiction to hear the matter. That grant of jurisdiction permitted this court to determine whether the 2003 PERS legislation breached any provision of the PERS statutory contract or violated the state or federal constitutions. For the most part, petitioners argued that each amendment set out above either breached or impaired an obligation of the PERS contract.

"Petitioners succeeded in two of their claims when this court identified two areas in which the 2003 PERS legislation had violated state law by depriving some PERS members of monies lawfully due them:

" 'We conclude that, in two respects, petitioners have prevailed on their claims for relief. First, petitioners in each of the cases correctly have argued that the provisions of the 2003 PERS legislation that alter the manner in which earnings are credited to the regular accounts of Tier One members impair an obligation of the statutory PERS contract in violation of Article I, section 21, of the Oregon Constitution. As such, those provisions are void and of no effect. Second, Strunk and Sartain petitioners are correct in their assertion that the provision of the 2003 PERS legislation that directs PERB to not apply annual COLAs to certain retired members' "fixed" service retirement allowances breaches the contrary obligation of the PERS contract to do so; that provision also is declared void and of no effect. In all other respects, we conclude that petitioners' claims for relief are not well taken.'

"Our decision in that regard effectively restored two aspects of the PERS benefit plan that the 2003 PERS legislation had removed: (1) the guarantee of an annual eight percent earnings allocation to all Tier One PERS members; and (2) COLA adjustments for members who had retired between April 1, 2000 and March 31, 2004."

341 Or at 179-80 (internal citations omitted; footnote omitted). After holding that petitioners were entitled to attorney

fees in this case, we identified certain factors that remained to be established before we could set those fee awards:

> "First, given that petitioners' efforts resulted in the creation of two funds in this case, we must ascertain, in particular, whether the beneficiaries are the same for both funds or if separate communities of beneficiaries correspond to each fund. Second, we must determine the proper method for apportioning the litigation costs among all the benefitted parties. And, finally, we must determine the extent of the benefits resulting from the legal services for which reimbursement is being sought, *i.e.*, the nexus between those services and the benefits procured, together with evidence of the services' reasonable value. Implicit in that last requirement is the understanding that (1) it is possible that some of the legal services expended in a common fund case will not have contributed directly to creating the fund from which fees are being sought; and (2) in cases with multiple parties and multiple attorneys, an overlap of labor may exist."

*Id.* at 185. As a result, we referred this matter to a special master to conduct further fact-finding proceedings and make recommendations regarding the reasonable attorney fees that should be awarded here under the common fund doctrine.[2]

In the proceedings that followed, petitioners presented their respective fee requests to the special master, along with the statements, affidavits, and exhibits needed to establish the reasonableness of those fees. Among other things, those documents set out the fee payment arrangements between petitioners and their respective lawyers. Petitioner Dahlin's lawyer had agreed to represent his client on a contingency basis and, consequently, had yet to bill or receive any payment from his client. Petitioner Sartain's legal fees were paid by Oregon Public Retirees, Inc. (OPRI); the Strunk petitioners' legal fees were paid by the PERS Coalition, a group of unions that represent public employees. The lawyers for those latter petitioners had, for the most part, been paid regularly for their work, but each had agreed to return money to the appropriate payor if the payments they had

---

[2] For a detailed explanation of the common fund doctrine and its application here, see *Strunk II*, 341 Or at 181-84.

received, together with the final fee awards, exceeded their respective fee bills.

The documents submitted to the special master also contained exhibits showing each group of lawyers' billing history as it had developed over the course of this case. Those fee bills documented, by dated entries, the tasks that lawyers or other staff had performed, the time spent in doing so, and the hourly rate at which that time had been billed. Multiplying the hours worked by the applicable rates and adding those sums together, petitioners' lawyers each arrived at a sum, which they each then sought to enhance by requesting respective multipliers of 1.5 (lawyers for petitioners Dahlin and Strunk) and 2.0 (lawyers for petitioner Sartain). Respondents, in turn, submitted a variety of objections to those fee bills.[3] At the same time, petitioners and respondents also submitted several stipulations—subject to approval by this court—demonstrating their consensus on several aspects of this fee matter.

First, both sets of parties stipulated to the preservation of a fund in this case that totals nearly $1.1 billion overall: $448.5 million in restored Tier One 8 percent earnings allocations and approximately $700 million in restored COLA adjustments. Second, the parties also stipulated to methodologies for apportioning the attorney fee awards from the preserved funds among the benefitted parties. In their third and final stipulation, the parties acknowledged that, following *Strunk I*'s $1.1 billion restoration of employee and retiree accounts, PERB had recalculated members' 1999 annual earnings. Member accounts, which had previously been credited with a 20 percent earnings rate for that year, were recalculated using an 11.33 percent earnings rate. The result, the parties agreed, was that PERB would recover approximately $388.9 million from the same accounts to which it had recently credited the $448.5 million in restored Tier One 8 percent earnings allocations. The parties also acknowledged that PERB had begun both the recalculation of retiree benefits based on that amended 11.33 percent 1999 earnings rate and the recovery of what PERB considered to be overpayments made under the old rate. The resulting

---

[3] Those objections are examined in greater detail below.

recapture of those benefits,[4] the parties stated, would more than offset the $700 million in COLA benefits returned to retirees in *Strunk I*. That said, however, petitioners refused to concede that PERB had the legal authority to take the actions described above and noted that legal challenges were presently pending with regard to those actions.

The initial fee requests made by petitioners' lawyers—including application of the requested multipliers—were as follows:

| Lawyers for: | Fees | Costs |
|---|---|---|
| Strunk petitioners | $ 998,005.50 | $ 23,922.34 |
| Sartain | $ 637,774.00 | $      480.00 |
| Dahlin | $ 709,620.00 | $ 10,099.64 |

The special master reconciled those requests with respondent's objections by focusing, in large degree, on the requested fees as a percentage of the recovered fund. Noting first that percentage-based fee requests in federal common fund cases generally comprised 6 to 25 percent of the total recovery, the special master opined that, in this case, any award in that range would produce fees in excess of $60 million and with it, concerns that petitioners' lawyers had received a windfall of inequitable proportions. In contrast, petitioners' actual fee requests amounted to only 0.24 percent of the recovered fund, or less than one-quarter of one percent of its total. Although modest when calculated as a percentage of the preserved fund, the special master acknowledged that the resulting fee awards could still nevertheless conceal billing practices that should not be countenanced. Consequently, the special master concluded that

> "an equitable and reasonable approach is to tentatively accept the full percentage requested as presumptively

---

[4] ORS 238.715(1) allows PERB to recover any sum improperly paid from the state retirement fund by:

> "(a) Reducing the monthly payment to the member or other person for as many months as may be determined by the board to be necessary to recover the overpayment or other improperly made payment; or

> "(b) Reducing the monthly payment to the member or other person by an amount actuarially determined to be adequate to recover the overpayment or other improperly made payment during the period during which the monthly payment will be made to the member or other person."

reasonable, given its extremely modest size, but nonetheless, review the factors identified by the court and the parties to determine if even a very modest percentage serves to disguise one or more concern areas."

Special Master's Findings and Recommendations on Attorney Fees p 9.

Applying that methodology, the special master recommended reducing petitioner's fee proposals by eliminating the law firms' charges for time spent in preparing their respective fee requests. The special master also recommended an increased cost award for the Strunk petitioners' lawyers based on their supplemental motion to cover the expenses of actuarial expert services. Apart from those amendments, however, the special master made few other changes to petitioners' fee requests. Consequently, the special master's recommendations to this court set forth the following as reasonable fees and costs:

| Lawyers for: | Fees | Costs |
|---|---|---|
| Strunk petitioners | $ 983,798.00 | $ 39,972.34 |
| Sartain | $ 606,974.00 | $    480.00 |
| Dahlin | $ 716,820.00[5] | $ 10,099.64 |

Respondents have since presented this court with objections to those proposed fee and cost awards. We turn now to examine respondents' objections in greater detail. *See Kahn v. Canfield*, 330 Or 10, 13-14, 998 P2d 651 (2000) (when attorney fee petitions comport with ORAP 13.10(5), this court's inquiry into those petitions are generally limited to examining objections regarding fees).

Respondents first contend that, in this case, the special master improperly justified the fees sought by initially viewing them, in part, as a very small and, therefore, presumptively reasonable, percentage of the preserved fund. For the reasons explained below, the special master's analysis in

---

[5] Despite the fact that the expressed attorney fee request from petitioner Dahlin's lawyer had been for $709,620, the special master nevertheless calculated the lawyer's attorney fees by multiplying the total hours listed on the lawyer's fee bill by the requested hourly rate to arrive at a total of $730,620. He then subtracted $13,800 for work related to the fee request itself to arrive at the total noted above.

that regard has no effect on this court's award of attorney fees.

■ ORAP chapter 13 sets forth the manner in which parties must seek attorney fees that arise from proceedings in Oregon's appellate courts. *See* ORAP 1.05 ("These rules apply to all proceedings in the Supreme Court and Court of Appeals.") and ORAP 13.10 (1) ("This rule governs the procedure for petitioning for attorney fees in all cases except the recovery of compensation and expenses of court-appointed counsel payable from the Public Defense Services Account."). With regard to appellate fee petitions, ORAP 13.10(5)(a) provides:

> "A petition shall state the total amount of attorney fees claimed and the authority relied on for claiming the fees. The petition shall be supported by a statement of facts showing the total amount of attorney time involved, the amount of time devoted to each task, the reasonableness of the amount of time claimed, the hourly rate at which time is claimed, and the reasonableness of the hourly rate."

As the text of that rule makes clear, petitions for attorney fees in Oregon's appellate courts must present billing entries containing specific data designed to aid the courts in determining the overall reasonableness of a fee request. Consequently, when a party objects to a petition for attorney fees submitted under ORAP 13.10(5)(a), more often than not, that objection must challenge the reasonableness of some or all of a fee petition's individual billing entries if the objection is to succeed. Petitioners and respondents have uniformly followed that rule here. As a result, this court will rely on ORAP 13.10(5)(a) as the basis for awarding attorney fees in this case; *i.e.*, we will award fees by scrutinizing the total amount of attorney time involved, the amount of time devoted to each task, the reasonableness of the amount of time claimed, the hourly rate at which time is claimed, and the reasonableness of the hourly rate.

■ Respondents next argue that the special master's report overstates the fund benefits that will actually accrue to Tier One members and retirees in this case. Despite their stipulation acknowledging the $1.1 billion fund preserved by

petitioners' efforts in *Strunk I*, respondents nevertheless contend that, as set out in the parties' third stipulation, PERB's subsequent recapture of funds from its recalculation of members' 1999 earnings allocations will effectively negate any benefit derived from the previously preserved fund. Indeed, respondents assert that, as the proximate cause of PERB's benefit recalculation, this court's decision in *Strunk I* will actually result in little or no gain to current Tier One members and may create a net loss for affected retirees. In respondents' view, the absence of a net benefit to Tier One members and retirees negates, in turn, the primary ground for awarding fees here. We disagree.

**4.** Fee award calculations under the common fund doctrine have long been recognized as focusing on the preserved or enlarged fund itself rather than the fund's net worth as measured against extrinsic factors:

> "In contrast to a statutory-fee determination, payable by the defendant depending on the extent of success achieved, *a common fund is itself the measure of success.* While the common fund recovered may be more or less than demanded or expected, *the common fund represents the benchmark on which a reasonable fee will be awarded.*"

Alba Conte, 1 *Attorney Fee Awards* § 2.7, 85 (3rd ed 1993) (emphases added). Adopting respondents' alternative analysis would essentially subvert the relative stability of final judgments in common fund cases—and the actual funds preserved as a result—in favor of a far more unpredictable postjudgment arena in which circumstances could be manipulated or manufactured to significantly reduce fee awards before they are finalized. Such an analysis would require a marked departure from the otherwise well-established practice noted above, and we decline to do so.

■ In a final fund-related argument, respondents contend that no further cost-spreading is required here to effectuate the equitable purpose of the common fund doctrine. Respondents note that both the PERS Coalition and OPRI—organizations that financed this litigation for the Strunk petitioners and petitioner Sartain, respectively—are composed of PERS members and PERS retirees. Respondents argue that, to the extent that equity requires the Tier One

PERS members and PERS retirees who have benefitted from this litigation to bear its costs, they have already done so through their financial support of the entities that sponsored this litigation. However, aside from providing approximate figures for the general membership of the PERS Coalition and OPRI, respondents have provided no evidence correlating those populations with the populations benefitted by this litigation, nor have they established with any degree of certainty the financial participation of individual PERS Coalition and OPRI members in that regard. As a result, we agree with the special master that the evidence in the record is insufficient to support respondents' arguments here and we reject them accordingly.

In addition to the fund-related objections noted above, respondents also direct a variety of objections toward the substance of the fee requests themselves. In general, respondents argue that (1) the hours claimed by petitioners' lawyers for certain tasks, (2) the market rates relied on by the Strunk petitioners' lawyers, and (3) the multipliers used to expand petitioners' fees, are all unreasonable. We address each of those arguments in turn.

As to the reasonableness of the hours billed by petitioners' lawyers in this case, respondents raise a variety of objections based on this court's acknowledgment that

"(1) it is possible that some of the legal services expended in a common fund case will not have contributed directly to creating the fund from which fees are being sought; and (2) in cases with multiple parties and multiple attorneys, an overlap of labor may exist."

*Strunk II*, 341 Or at 185. Drawing on that statement, respondents object to what they view as the special master's implicit conclusion that it was reasonable for petitioners' lawyers to seek compensation for labor that did not actually aid in the creation of the preserved fund; *i.e.*, labor expended on (1) claims that were duplicative or without merit, (2) unrelated cases, (3) general public relations activities, and (4) legal work that took place after this case had been argued and submitted in this court.

With regard to the issue of duplicative legal efforts, respondents contend that the hours worked by the lawyers for petitioner Dahlin and petitioner Sartain should be reduced because the claims they successfully advanced were also briefed and argued by the lawyers for the Strunk petitioners. PERB and nonstate respondents, however, part company with each other regarding the size of the reduction that should be required as a result.

Nonstate respondents appear to argue that we should disallow *all* the fees sought by the lawyers for Dahlin and Sartain on the grounds that the Tier One employees and retirees affected by this case will otherwise pay several times over for a benefit they would have received in any event through the efforts of the Strunk petitioners' lawyers. By its terms, however, that argument assumes that the efforts of the Strunk petitioners' and their lawyers was the *sine qua non* of the fund preserved here, while the work product of the other parties named as petitioners in this case derived solely from that effort. Nonstate respondents, however, point to nothing in the relevant billing entries, affidavits, petitioners' briefs—in short, the record—to substantiate that position. Consequently, we are left only with the fact that petitioners' lawyers briefed some of the same issues in the course of bringing their cases to this court. In our view, that fact, without more, is insufficient to support the reduction proposed by nonstate respondents.

PERB, on the other hand, argues that an across-the-board 15 percent reduction in hours for all petitioners' lawyers would suffice for the duplication that allegedly occurred here. PERB cites the Ninth Circuit's decision in *In re Washington Public Power Supply System Securities Litigation* (*In re WPPSS III*), 19 F3d 1291 (9th Cir 1994) to support that proposition. Although PERB's position is less onerous than the one taken by nonstate respondents, it is no less unavailing. Although PERB conducted an exhaustive examination of petitioners' billing records and, as we make clear below, has cited that work to good effect here, like nonstate respondents, PERB is unable to point this court to anything in the record that creates a factual basis for its duplication argument. Consequently, PERB's reliance on *In re WPPSS III* is misplaced. In that case, the Ninth Circuit

upheld a reduction of hours for duplicated work based on a recitation of specific examples from the billing records. *See id.* at 1298 ("specific examples" justified 12-15 percent cuts in the hours billed by three attorneys in federal common fund case). Such examples are absent here.

That said, however, after examining respondents' other billing-related objections and carefully scrutinizing petitioners' billing records, we conclude that the requisite nexus between the benefits provided in this case and the fees sought as a result is missing for some items that petitioners' seek compensation for. We therefore agree with respondents that some of the billing entries before us lack any colorable connection to the creation of the preserved fund at issue here.

The special master identified an entire category of such items when, following respondents' objections, he concluded that the time spent in preparing petitioners' fee requests in this case did not, in fact, contribute to the preserved fund and should therefore be eliminated. That issue is a matter of first impression for this court. We need not, however, examine it here. Petitioners expressly accepted the special master's recommended fee allocations, which included the reductions for fee-related work noted above, and have not attempted to rekindle that issue. Consequently, the question of whether those reductions were well-taken is not before this court. We therefore accept the special master's conclusion that time billed for fee recovery in this common fund case is not compensable from the fund; we will not consider such billing entries in formulating our final attorney fee awards.

■ Other examples of billing entries that we will not consider here because the work they reflect did not benefit the fund include hours billed for: (1) work on issues over which this court lacked jurisdiction to hear or which petitioners lacked standing to bring; (2) conducting press conferences or posting press release information on the Internet; (3) work that appears to have been done on unrelated cases; (4) redacted work entries that do not disclose the nature of the work done; (5) legal fees for which there are no accompanying billing entries or records; and (6) tasks performed after

this court's decision in *Strunk I* had issued.[6] As a result, we reduce the overall hours billed by petitioners' lawyers as follows: (1) Strunk—reduction of 205.50 hours; (2) Sartain—reduction of 132.80 hours; and (3) Dahlin—reduction of 116.80 hours.[7]

Respondents next challenge the hourly billing rates reflected in the Strunk lawyers' fee request.[8] To help understand the particulars of respondents' argument, a brief recitation of the relevant facts is in order.

According to the fee affidavit submitted by the Strunk petitioners' law firm, legal representation for the Strunk petitioners was paid for—as previously noted above—by the PERS Coalition. The Coalition was a longstanding client of the law firm and, because of that relationship, the firm provided legal services to member unions at reduced rates that ranged downward from $175.00 per hour. The firm's fee agreements with its union clients, however, provided that any opportunities to secure court-awarded attorney fees would be pursued at higher "market rates," and, should such fees be recovered, that the firm would return the monies paid by the Coalition while retaining the court-awarded fees. The firm agreed to represent the Strunk petitioners on that same

---

[6] If, immediately after *Strunk I*, some post-decision action by petitioners' lawyers—a successful motion for reconsideration, for example—had served to increase the fund or directly benefit fund beneficiaries, that time would, of course, be compensable as a charge upon the fund. That was not the case here. Generally, the work done by petitioners' lawyers after *Strunk I* was decided revolved around an unsuccessful bid for reconsideration, meetings between the various lawyers, and the creation of the lawyers' respective fee petitions, none of which benefitted the fund itself.

[7] Respondents, in contrast, calculated the required reduction of hours as: (1) Strunk—1,195.99 hours; (2) Sartain—730.73 hours; and (3) Dahlin—1,066.62 hours.

[8] The special master found that the respective hourly rates proposed by all the petitioners' law firms in this case were reasonable. Here, respondents challenge only the billing rates of the Strunk petitioners' legal counsel and not the rate for petitioner Dahlin's lawyer—which is essentially the same—nor the rates for petitioner Sartain's lawyers—which are lower. As we already have noted, when attorney fee petitions comport with the requirements of ORAP 13.10(5)—as the ones now before us do—our inquiry into those petitions is generally limited to examining the objections opposing those fees. *Kahn*, 330 Or at 13-14. As a result, the validity of the rates sought by the lawyers for petitioners Sartain and Dahlin are not at issue here and we accept the special master's recommendation to view those rates as reasonable.

basis and now seeks fees at "market rates," that reflect a high point of $400 per hour.

Opposing that hourly rate, respondents contend that, under *Associated Oregon Veterans v. DVA*, 308 Or 476, 782 P2d 418 (1989), lawyers for the Strunk petitioners cannot seek fees at a rate above that at which they have already been compensated in this case. *Associated Oregon Veterans* was a case in which the plaintiffs had unsuccessfully attempted to bring a declaratory judgment action against the Department of Veteran Affairs (DVA) regarding various farm and home loans the plaintiffs had taken out through the agency. The terms of the plaintiffs' loan contracts with the DVA expressly granted reasonable attorney fees to the prevailing party in any contract-related litigation and the trial court subsequently awarded $35,700 to the DVA as a result. On review, the plaintiffs argued, among other things, that the trial court's fee award was unreasonable because it exceeded the $27,318, which the attorney general's office—as the DVA's legal counsel—had actually billed the agency. This court agreed, stating:

> "It is the party's right to the attorney fees under the contract. The party, again, although a public party, is not entitled to more than it spent on attorney fees."

*Id.* at 481. Relying on that holding, respondents now appear to argue that, where the right to common fund attorney fees is present, lawyers seeking such fees must do so using the hourly rates originally extended to their clients at the onset of the lawyer/client relationship.

■　　Respondents' reliance on *Associated Oregon Veterans* would, perhaps, be more effective if the right to fees at issue here derived—as it did in *Associated Oregon Veterans*—from a contract; that, however, is not the case. Any right to fees from the fund created here arises solely from this court's equitable authority to dispense such fees pursuant to the common fund doctrine. And under that doctrine, two separate bases for attorney fee awards arise together in the wake of a created or preserved fund: the first inures to successful plaintiffs; the second to the successful plaintiffs' lawyers.

The United States Supreme Court recognized a plaintiff's right to common fund attorney fees—essentially the right to reimbursement for legal expenditures—in *Trustees v. Greenough*, 105 US 527, 26 L Ed 1157 (1881), the Court's first common fund decision. In *Greenough*, the lone plaintiff had, through his lawyer, initiated a legal action that succeeded in preserving a substantial trust fund from destruction by the fund's trustees. In addition to benefitting the plaintiff as a shareholder in the fund, the litigation had similarly benefitted the other shareholders who had not participated in the litigation. Because all had been benefitted, the Court concluded that the plaintiff should be reimbursed for his legal expenses as a matter of equity, holding that

> "where one of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement, either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts."

*Id.* at 532-33.

Three years later, in *Central R.R. & Banking Co. v. Pettus*, 113 US 116, 5 S Ct 387, 28 L Ed 915 (1885), the Court established a similar right to common fund fees for the prevailing lawyers in such cases. As the Court's disposition of *Pettus* would make clear, that right could be exercised independently of a plaintiff's entitlement under *Greenough*.

In *Pettus*, two law firms had joined forces to bring a creditors' bill in Alabama state court to reach assets of the debtor, an Alabama railroad line that had been taken over by several Georgia corporations. The law firms had brought the action on behalf of clients who were unsecured creditors of the Alabama railroad. The record showed that the law firms had agreed to represent their clients for relatively modest retainers, with the express understanding that, if successful, the law firms would seek an additional five percent of the preserved fund from any other creditors benefitted by the law firms' work. The record also showed that, without that understanding, the law firms would have sought a higher rate of compensation from their clients at the onset of their business relationship.

The law firms' action was a success, preserving a substantial fund that benefitted not only the law firms' clients, but all similarly situated creditors of the railroad as well. Although their clients paid the law firms their agreed-upon fees, the firms nevertheless initiated a separate action on their own behalf to recover fees from the unrepresented creditors who had also benefitted from the law firms' legal efforts. That action, too, was successful and the Federal Circuit Court for the Middle District of Alabama eventually issued the law firms a lien on railroad property to secure payment of their fees.

On review before the United States Supreme Court, the corporations controlling the Alabama rail line argued that the law firms had already received their fees from their clients and should therefore recover no more. Ultimately, however, the Supreme Court disagreed, awarding the law firms—in addition to the compensation received from their clients—$17,580 in attorney fees from the common fund, as well as the property lien established below to secure payment. In doing so, the Court drew again on the equitable principles that it had announced in *Greenough*, but this time applied those principles to the lawyers whose labors had actually preserved the fund in question:

> "[I]t seems to us that the present case is embraced by the reason of the rule announced in *Trustees v. Greenough*. When the litigation was commenced, the unsecured bonds of the Montgomery & West Point Railroad Company were without any value in the financial market. That litigation resulted in their becoming worth all, or nearly all, that they called for. The creditors who were entitled to the benefit of the decree had only to await its execution in order to receive the full amount of their claims; and *that result was due to the skill and vigilance of the* [law firms]*, so far as the result of litigation may, in any case, be referred to the labors of counsel.*"

*Id.* at 126 (emphasis added).

Here, using *Pettus*[9] as a lens through which to view respondents' objections to the Strunk lawyers' hourly rates, it

---

[9] Although Oregon courts have had little need to cite *Pettus* since its 1885 publication, federal decisions have since consistently acknowledged its central tenet that lawyers for prevailing parties in common fund cases possess, with their clients, concomitant rights to fees from the preserved funds. *See, e.g., Boeing Co. v.*

is easy to see that respondents' reliance on *Associated Oregon Veterans* is misplaced. That case is not a common fund case and, consequently, fails to take into account a successful attorney's equitable right to common fund fees under *Pettus*. The Strunk lawyers—like the lawyers in *Pettus*—took this case at a relatively low rate of compensation with the understanding that, if the opportunity for court-awarded fees presented itself, they would pursue those fees at a substantially higher rate. And like the lawyers in *Pettus,* having played a major role in preserving the fund before us, the Strunk lawyers are now free to do exactly that, so long as the rates they pursue are "reasonable." Here, uncontroverted affidavits and expert testimony support the reasonableness of the Strunk lawyers' rate request, as does the fact the $400 hourly rate they seek for the most senior of their lawyers is the same rate sought—without objection from respondents—by petitioner Dahlin's lawyer. Those elements, combined with the fact the Strunk lawyers have agreed to reimburse the PERS Coalition for the fees it has paid, lead us to conclude that respondents' objections to the hourly rate sought by the Strunk lawyers are without merit. We agree with the special master's assessment that the hourly rates proposed by all the petitioners' lawyers are reasonable as applied here.

Respondents next assert that the special master erred in awarding the fee multipliers requested by petitioners' lawyers in this case. Respondents begin by noting that such multipliers are generally appropriate only in the face of "exceptional success." *See, e.g., Hensley v. Eckerhart,* 461 US 424, 435, 103 S Ct 1933, 76 L Ed 2d 40 (1983) (recognizing that in "some cases of exceptional success, an enhanced award may be justified"). Respondents then argue that, because petitioners failed to prevail on all their claims in *Strunk I,* they have failed to achieve that standard here.

*Van Gemert,* 444 US 472, 478, 100 S Ct 745, 62 L Ed 2d 676 (1980) (recognizing that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F2d 268, 271 (9th Cir 1989) (noting that, since *Pettus,* "it is well settled that the lawyer who creates a common fund is allowed an extra reward, beyond that which he has arranged with his client, so that he might share the wealth of those upon whom he has conferred a benefit"); *Peter Fabrics, Inc. v. S. S. Hermes,* 765 F2d 306, 318 (2nd Cir 1985) (recognizing two bases for common fund attorney fees: one arising under *Greenough* for plaintiffs and one arising under *Pettus* for lawyers).

■ ■ We disagree. As we recognized above, in common fund cases, the preserved fund itself is a primary measure of success. Here, that fund exceeds one billion dollars. When considered in light of all the facts underlying this controversy, a recovery of that magnitude is an "exceptional success," despite petitioners' failure to prevail on all their claims. In addition, factors such as the difficulty and complexity of the issues involved in this case, the value of the interests at stake, as well as the skill and professional standing of lawyers involved also support an enhancement of fees. *See Newbern v. Gas-Ice Corp.*, 263 Or 250, 258, 501 P2d 1294 (1972) (listing factors beside time spent that this court will consider in determining reasonableness of attorney's fees). Consequently, this court will allow the fee awards in this case to be enhanced by applying the respective multipliers requested by petitioners' lawyers.

Finally, respondents object to the special master's recommended cost awards. Respondents argue that in *Strunk II*, this court explicitly recognized that it had previously denied costs in *Strunk I* and that, consequently, we should dismiss petitioners' attempts to reopen that issue. Alternatively, respondents contend that if this court chooses to reconsider the issue of costs, then we should reduce petitioners' cost requests to reflect petitioners' limited success in this matter.

■ ■ In our view, the issue of costs and disbursements in this case does warrant a second look. Our decision to deny costs in *Strunk I* was premised on the assumption that a cost award at that point in this matter would simply shift a significant portion of petitioners' litigation expenses onto respondents, a shift, we concluded, that neither statute nor equity required. That assumption, however, failed to anticipate our subsequent application of the common fund doctrine here. As we noted in *Strunk II*, instead of shifting fees and costs to the losing parties, the common fund doctrine works to

"spread litigation expenses among *all beneficiaries* of a preserved fund so that litigant-beneficiaries are not required to bear the entire financial burden of the litigation while inactive beneficiaries receive the benefits at no cost."

341 Or at 181 (emphasis added). When viewed in that light, the original basis for denying cost awards in this case disappears, replaced, instead, by an equitable rationale aimed at avoiding the unjust enrichment of some by distributing cost burdens—like attorney fees—equally among all benefitted parties. Consequently, we hold that the reasonable costs and disbursements incurred by petitioners' lawyers should also be distributed among the parties who have benefitted here. As to respondents' argument that those costs should be reduced due to petitioners' limited success, we reiterate our previous position that, under the facts of this case, the $1.1 billion dollar fund preserved here represents an exceptional recovery for plaintiffs. Respondents raise no other argument to suggest that any of the costs itemized by petitioners lawyers are *per se* unreasonable and our own examination of those cost bills reveals nothing to support a contrary conclusion.

Having addressed respondents' arguments regarding the fee and cost awards that should issue in this matter, we turn, at last, to finalize those awards. We accept the parties' stipulations regarding the size of the fund preserved here. We also accept the parties' stipulated methodology for apportioning fee award expenses among all the benefitted parties. Multiplying the reasonable hourly rates set forth above by the hours we have concluded were reasonably expended in preserving the common fund in this case, we hold that the following are reasonable attorney fees and costs and order them to be awarded accordingly:

| Lawyers for: | Fees | Costs |
|---|---|---|
| Strunk petitioners | $ 878,596.00 | $ 39,972.34 |
| Sartain | $ 533,245.00 | $ 480.00 |
| Dahlin | $ 660,540.00 | $ 10,099.64 |

It is so ordered.